**NEW YORK AIRWAYS, INC.**
**v.**
**The UNITED STATES.**

**LOS ANGELES AIRWAYS, INC.**
**v.**
**The UNITED STATES.**

**CHICAGO HELICOPTER AIR-**
**WAYS, INC.**
**v.**
**The UNITED STATES.**
**Nos. 168-65, 234-65, 343-65.**

United States Court of Claims.
Dec. 16, 1966.

Leslie H. Arps, New York City, attorney of record, for plaintiff New York Airways, Inc. Stephen M. Axinn, New York City, of counsel.

James M. Verner, Washington, D. C., attorney of record, for plaintiff Los Angeles Airways, Inc.

Robert W. Oliver, Washington, D. C., attorney of record, for plaintiff Chicago Helicopter Airways, Inc.

John C. Ranney, Washington, D. C., with whom was Acting Asst. Atty. Gen. J. William Doolittle, for defendant.

Before COWEN, Chief Judge, JONES, Senior Judge, LARAMORE, DAVIS, and COLLINS, Judges.

PER CURIAM: *

These are three parallel suits by three helicopter companies which were not paid sums alleged to be due them from April 1965, for carrying the mail. Plaintiff in No. 168–65, New York Airways, Inc. has continuously operated since 1960 a helicopter service in the New York City metropolitan area under a certificate of public convenience and necessity issued by the Civil Aeronautics Board (the "Board") pursuant to section 401 of the Federal Aviation Act of 1958 (the "Act", 49 U.S.C. § 1301 et seq.), authorizing this plaintiff to carry passengers, property, and mail. Under its statutory authority the Board promulgated Order No. E–20495, dated February 20, 1964, fixing monthly compensation to be paid this plaintiff (as well as the other two) for transporting mail, which included both service and subsidy elements. By April 1965 funds for the subsidy element of compensation earmarked by the Appropriations Act for fiscal year 1965 (78 Stat. 640) were exhausted, and the plaintiff was not paid a balance of $94,377.26 due it for the April subsidy payment. Plaintiff in No. 234–65, Los Angeles Airways, Inc., has performed a similar operation in the Los Angeles area under a Board certificate issued in 1958, and Order E–20495 likewise fixed monthly compensation for it which was not paid for April 1965 (in the amount of $79,474.91), for May 1965 ($135,518.47), and for June 1965 ($131,146.91) (a total of $346,140.-29). Chicago Helicopter Airways, Inc., complainant in No. 343–65, has operated in the Chicago area under a certificate issued in 1963; its compensation under Order E–20495 was not paid for April, May, and June 1965 (in the amount of $173,071.80). All parties have moved for summary judgment and there are no disputes on any relevant issue of fact.

The key questions are (1) whether the particular wording of the Act empowers the Board to obligate the United States for the payment of an agreed subsidy in the absence or deficiency of a congressional appropriation, and (2) whether an appropriation act amended the basic

---

* This opinion incorporates, with minor modification, the opinion prepared by Trial Commissioner C. Murray Bernhardt, at the direction of the court under Rule 54(b), in No. 168–65.

Act with respect to the Board's rate-making power. The plaintiffs prevail as to each of these issues.

Subsections 401(*l*) and (n) (3) of the Act (49 U.S.C. § 1371(*l*) and (n) (3)) require carriers which are certificated to transport mail to do so whenever directed by the Postmaster General, on pain of forfeiting certification, for which services they are "entitled to receive reasonable compensation therefor as hereinafter provided."[1] The duty of fixing reasonable compensation is imposed on the Board by section 406(a) of the Act (49 U.S.C. § 1376(a)).[2] The compensation includes a "service element" and a "subsidy element."[3] The service element is for the actual cost of transporting the mail, and the subsidy element is defined in section 406(b) of the Act (49 U.S.C. § 1376(b)), which lists as one of the factors to be considered by the Board in determining the "fair and reasonable rates of compensation"—

(3) the need of each such air carrier (other than a supplemental air carrier) for compensation for the transportation of mail sufficient to insure the performance of such service, and, together with all other revenue of the air carrier, to enable such air carrier under honest, economical, and efficient management, to maintain and continue the development of air transportation to the extent and of the character and quality required for the commerce of the United States, the Postal Service, and the national defense.

The initial issue derives from the phrases italicized in the following rendition of section 406(c) of the Act (49 U.S.C. § 1376(c)):

The Postmaster General shall make payments *out of appropriations* for the transportation of mail by aircraft of so much of the total compensation as is fixed and determined by the Board under this section without regard to clause (3) of subsection (b) of this section. The Board shall make payments of the remainder of the total compensation payable under this section *out of appropriations made to the Board for that purpose.*

The question at this point is whether the second italicized phrase allows the Board to pay subsidies only to the extent that Congress appropriates money to it for that specific purpose, or whether section 406(c) as a whole merely defines the ministerial responsibility of the two agencies for disbursement of service and subsidy payments to the carriers. The latter construction is indicated by analysis of related provisions, legislative history, and the views of the Comptroller General.

Under the statutory predecessor of section 406 (section 406 of the Civil Aeronautics Act of 1938) all of the money for subsidies was paid out of appropriations to the Postmaster General for carrying the mail, until Reorganization Plan No. 10 of 1953 (67 Stat. 644) directed the Postmaster General to pay for the actual transportation of mail and the Board to pay the subsidy. The purpose

---

1. Section 401(*l*) provides:
"Whenever so authorized by its certificate, any air carrier *shall* provide necessary and adequate facilities and service for the transportation of mail, and *shall transport mail whenever required by the Postmaster General.* Such air carrier *shall* be entitled to receive reasonable compensation therefor as hereinafter provided" (emphasis supplied).

2. Section 406(a) provides in part:
"The Board is empowered and directed, upon its own initiative or upon petition of the Postmaster General or an air carrier, (1) to fix and determine from time to time, after notice and hearing,

the fair and reasonable rates of compensation for the transportation of mail by aircraft, the facilities used and useful therefor, and the services connected therewith. * * *"

3. The Board's Order No. E-20495 declared "that the fair and reasonable final rates of compensation to be paid" the plaintiffs "for the transportation of mail by aircraft, the facilities used and useful therefor, and the services connected therewith" "are the sum of (a) each carrier's respective service mail pay as established in other orders of the Board and (b) subsidy as follows".

of this modification was to remove from the Post Office budget a subsidy item that had no intrinsic relation to the postal mission, so that Congress could maintain an effective review of the subsidy program. The Comptroller General advised the Board (Opinion No. B–103841, 34 Comp.Gen. 158 (1954)) that neither the Reorganization Plan nor the Presidential message accompanying it should be interpreted to limit the rate-making power of the Board by the existence or the amount of appropriations. He expressly avoided as hypothetical the question of whether a carrier could recover by suit its Board-granted subsidy in the absence of adequate appropriations to pay the subsidy. The Presidential message advised that the modification effected to section 406 would "give Congress an opportunity to review and take any appropriate action with respect to the level of subsidy aid in the course of the regular appropriation process.", and the Comptroller General interpreted this to be "really a reference to the opportunity afforded the Congress, through the appropriation process, to make an informed analysis of the subsidy element of mail pay and thus be in a position to effect any necessary or desirable revision of the law." He believed that it would be "an incorrect expression of the legal significance of the provisions of the Plan" to interpret it as giving Congress complete control over subsidy payments through appropriations.

If the limitation concept urged by the defendant were correct it would logically oblige both the Postmaster General and the Board to confine their respective service and subsidy payments to carriers within the scope of amounts specifically appropriated, for the statutory terms as to each are comparable. Strategic punctuation of the first sentence of section 406(c) [4] would make it clear that appropriation restrictions do not apply to the Postmaster General's payment of the service element, although concededly without such punctuation an opposite construction is possible but unlikely. Regardless of these semantic niceties, once the services are rendered the failure of Congress to grant appropriations would not relieve the Government of its contract obligation (see infra) to pay carriers through the Postmaster General for the transportation of mail at service rates set by the Board. It would be inconsistent to assume that Congress would have intended the obligation to pay the service element of compensation to be enforceable and the correlative obligation to pay the subsidy element unenforceable, when the authorization as to each is couched in similar terms of alleged limitation.[5] The Board's authority with respect to the one is surely as broad as to the other. Even without this analogy it is possible to read the second sentence of section 406(c) as a representation that sufficient appropriations will be made for the Board to meet the subsidy payments which it sets, rather than as a ceiling upon payments. Deficiency appropriations are commonly enacted to rectify poor guesses or meet unanticipated developments. Section 401($l$), supra, draws no distinction between the portions of the compensation payable by the Postmaster General and the Board, and we may assume that none was intended. Moreover, the Board's duty under section 406 (a) and (b) of the Act to fix and determine fair and reasonable rates of compensation is not therein affirmatively conditioned upon the existence or adequacy of appropriations by Congress to pay the moneys which may fall due as the result of the Board's exercise of its rate-making power. Finally, the parenthetical insertion in section 406(c) excluding supplemental carriers from subsidy payments was incorporated by amendment in 1962 (76 Stat. 145), suggesting that where Congress intends to eliminate or curtail subsidies to certain

4. I. e., bracketing "out of appropriations" in commas.

5. In his letter submitting Reorganization Plan No. 10 of 1953, supra, the President stated that the reorganization plan would not in itself "change the aggregate amount of revenue for which any airline is eligible."

carriers it accomplishes it forthrightly rather than by pursestring inference.

The legislative history of appropriations under section 406(c) of the Act does not support defendant's restrictive interpretation. In each of the fiscal years 1962 through 1965 Congress successively reduced the subsidy payments for helicopter operations under the immediately preceding year, making it clear that it did not want the budgeted amounts to be exceeded. The carriers and the Board were aware of the legislated limitations. In setting reasonable rates the Board recognized a duty to determine the needs of the carriers in accordance with the standards set forth in the appropriation acts, although at the same time it did not interpret the appropriation limitation as an amendment to the substantive powers given the Board under the Act. The fiscal limitation was deemed by the Board to be a relevant but not controlling factor in determining the scope of the annual experiment it was to underwrite.

Despite the deliberate action by Congress in appropriating less than the amounts required to meet subsidy payments set by the Board, that the action was precatory rather than mandatory, and that Congress was well-aware that the Government would be legally obligated to pay the carriers whatever subsidies were set by the Board even if the appropriations were deficient, is evident in the floor debates during the period from 1961 through 1965. The subsidy was recognized by responsible members of Congress on both sides as a contractual obligation enforceable in the courts which could be avoided only by changing the substantive law under which the Board set the rates, rather than by curtailing appropriations. The Board made its position abundantly plain in testimony before congressional committees, such as the following testimony of the Board chairman before a Senate Appropriations Subcommittee in explaining the Order setting the rates giving rise to this suit:

> It has been the opinion of the Board's counsel that the limitation on the helicopter subsidy appropriations by Congress in fiscal years 1962 through 1964 does not constitute an amendment or modification of the standards of section 406 of the Federal Aviation Act.
>
> As a result, unless action is taken by Congress to amend the act, the Board must necessarily continue to be guided by such standards and principles in carrying out its duties and responsibilities. If the promulgation of subsidy orders—including the one of February 20—pursuant to section 406 results in subsidy claims by the helicopter operators in excess of the amounts appropriated by Congress, we believe that the Board would be obliged to seek a supplemental appropriation, or alternatively, the operators would be entitled to pursue their remedy in the Court of Claims to recover the amounts of subsidy due them over and above the amounts appropriated to the Board. [*Hearings Before the Subcommittee of the Senate Committee on Appropriations on H.R. 11296*, 88th Cong., 2d Sess. 107 (1964).]

Similar advice has been given by the Board over the years to numerous congressional committees. The principle has been reemphasized by the Board in numerous of its opinions fixing helicopter subsidy rates for periods commencing in 1962. Both Congress and the Board were at all times aware that a problem existed, and there was general acceptance of the view that to alter the Government's obligation to pay subsidies set by the Board would require amendment to the substantive Act, and that it could not be accomplished merely by withholding appropriations.

There is substantial economic support for the Board's position. This is exemplified by the Board's normal practice of issuing subsidy orders for eligible carriers containing no expiration dates, covering indefinite future periods for which no appropriations have been provided by Congress at the time of rate fixing. Such treatment was deemed necessary in order to provide reasonable assurance of carrier stability to the investment public

by enabling the carriers to plan future operations beyond current appropriation periods. In the course of a two-year period covering fiscal years 1962 and 1963 the Board had limited its subsidy rates for helicopter carriers to annual periods coinciding with current appropriations, in order to comply with the expressions of congressional intent as to the scope of helicopter subsidies, but deserted this practice when it was found to be disadvantageous to carrier efficiency. The defendant contends that the Board had no authority to establish an open-end rate for helicopter subsidies because of the language in the appropriation acts limiting use of subsidy funds to the fiscal year. If the authority of the Board to fix mail and subsidy rates binding upon the Government were circumscribed by the availability of annual appropriations, no binding rates could ever be set for more than a single year and the economic considerations which have induced the Board customarily to fix rates for the indefinite future would be entirely frustrated. Congress was aware of the Board's practice of issuing open-end rate orders when section 406 of the Act was amended in 1958 to incorporate the controversial subsection (c), and its failure at that time to amend subsections (a) and (b) of section 406 to deprive the Board of authority to fix binding rates for the future in the absence of an appropriation may be read as tacit approval of the practice and the power. The Board has been created by Congress to determine fair and reasonable rates on the basis of lengthy, detailed hearings. The role of the Board was not designed to be merely advisory, nor was the intention to deposit in Congress the ultimate authority to determine rates through the annual appropriation process.

 The case law supports the plaintiff's position as to the effect of section 406(c) of the Act. It has long been established that the mere failure of Congress to appropriate funds, without further words modifying or repealing, expressly or by clear implication, the substantive law, does not in and of itself defeat a Government obligation created by statute. United States v. Vulte, 233 U.S. 509, 34 S.Ct. 664, 58 L.Ed. 1071 (1914); Ralston v. United States, 91 Ct. Cl. 91 (1940), cert. denied, 311 U.S. 687, 61 S.Ct. 65, 85 L.Ed. 444, involving a lack of appropriations to pay a naval officer his retired pay and allowances pursuant to a special act placing him on the retired list. The failure to appropriate funds to meet statutory obligations prevents the accounting officers of the Government from making disbursements, but such rights are enforceable in the Court of Claims. Gibney v. United States, 114 Ct.Cl. 38, 51, 52 (1949); Leonard v. United States, 80 Ct.Cl. 147 (1935); New York Central R. R. v. United States, 65 Ct.Cl. 115, 128 (1928), aff'd, 279 U.S. 73, 49 S.Ct. 260, 73 L.Ed. 619 (1929); Danford v. United States, 62 Ct.Cl. 285 (1926); Strong v. United States, 60 Ct. Cl. 627, 630 (1925); Ferris v. United States, 27 Ct.Cl. 542, 546 (1892). Where, however, a construction contract expressly provided that the quantities of work ordered shall be kept "within the limits of available funds", and a statute prohibited obligating the Government to pay a larger sum for any public improvement than covered by a specific appropriation, extra work ordered and performed in excess of the appropriation was held not to create an obligation against the Government enforceable in the courts. Sutton v. United States, 256 U.S. 575, 41 S.Ct. 563, 65 L.Ed. 1099 (1921). The injunction in the *Sutton* contract that work was to be kept "within the limits of available funds" was, when coupled with the public statute excluding any obligation for work in excess of appropriations, a much more positive ₚrohibition than the disputed language in section 406(c) of the Act under consideration which the defendant construes as restricting the plaintiff's subsidy payments to appropriated funds. Similarly, in Shipman v. United States, 18 Ct.Cl. 138 (1883), where the contract provided that "the work to be done and the materials to be furnished under this agreement shall be restricted to the amount allowed by Con-

gress for this purpose", and R.S. 3732 prohibited contracts with the Government not authorized by law or under appropriations not adequate for their fulfillment, the court dismissed the petition, saying at page 146–147:

> The liability in this case rests wholly upon the appropriation, and is different from those cases which frequently arise wherein Congress passes an act authorizing officers to construct a building or do other specified work, without restriction as to cost, and then makes an appropriation inadequate to do the whole of it or makes none at all.

> In such cases the authority to cause the work to be done and to make contracts therefor is complete and unrestricted. All work, therefore, done under the direction of the officers thus charged with the execution of the law creates a liability on the part of the Government to pay for it, and if a written contract be made and work be done in excess of the contract-specifications, or entirely outside of or in addition to the written contract, and such work inures to the benefit of the United States, in the execution of the law, or is accepted by the proper public officers, a promise to pay its reasonable value is implied and enforced.

■ It is apparent, then, that in order to accomplish the restrictive effect of the contracts and enactments in the *Sutton* and *Shipman* cases, supra, Congress in this instance would have been required to incorporate into section 406 of the Act, either directly or by affirmative amendment in the appropriation act, suitable terminology restricting the Board's authority to set rates under section 406 beyond available appropriations. The Board's views of the legal effect of section 406(c), the economic needs of the carriers, and the failure of Congress to cure doubts by statutory means within its command, persuade adoption of that interpretation of the ambiguous act favorable to the carrier's contention.

The second issue is whether the following provision of the Independent Offices Appropriation Act for fiscal 1965 (78 Stat. 640, 642 (1964)) amended section 406(c) of the Federal Aviation Act of 1958 with respect to the Board's ratemaking power:

Payments to Air Carriers (Liquidation of Contract Authorization)

> For payments to air carriers of so much of the compensation fixed and determined by the Civil Aeronautics Board under section 406 of the Federal Aviation Act of 1958 (49 U.S.C. 1376), as is payable by the Board, *including not to exceed $3,358,000 for subsidy for helicopter operations during the current fiscal year, $82,500,000,* to remain available until expended. (Emphasis supplied.)

■ As a general proposition Congress has the power to amend substantive legislation for a particular year by an appropriation act, although such procedure is considered undesirable legislative form and subject to a point of order. An amendment will not readily be inferred. The intent of Congress to effect a change in the substantive law via provision in an appropriation act must be clearly manifest. The application of the limitation in the appropriation provision to a single year suggests that no change in substantive law was intended. NLRB v. Thompson Products, 141 F.2d 794 (C. A. 9, 1944). "Repeals by implication are not favored", it is ruled in United States v. Langston, 118 U.S. 389, 393, 6 S.Ct. 1185, 1187, 30 L.Ed. 164 (1886), where our Minister to Haiti was found entitled to his statutory salary despite the terms of an appropriation act providing funds for a lower salary and declaring that "all acts, or parts of acts, inconsistent or in conflict therewith, or which allow a larger salary to any officer or employee herein named, shall be, and are hereby, repealed." Id. at 391, 6 S.Ct. at 1186. The intention to repeal substantive law was more manifest in the *Langston* case than in the provision of the appropriation act quoted above placing a purported ceiling on helicopter subsidies for the fiscal year 1965, yet it was held not sufficient to accomplish a repeal.

In United States v. Dickerson, 310 U.S. 554, 60 S.Ct. 1034, 84 L.Ed. 1356 (1940), stressed by defendant, it was held that an appropriation proviso precluding the use of appropriated funds to pay reenlistment allowances provided by an extant military pay law constituted, in the light of its legislative history, a clearly expressed intention of Congress to suspend the substantive statute. But in Gibney v. United States, 114 Ct.Cl. 38 (1949), the *Dickerson* case was distinguished in that the peculiar wording of the limitation and its repetition and stated purpose in appropriation acts for successive years constituted in combination a temporary suspension of the legislative authorization, rather than a mere limitation on the use of funds for the year concerned. The *Gibney* case involved a proviso to an appropriation act for the fiscal year 1948 purporting to prohibit use of the appropriation for the Immigration and Naturalization Service to pay overtime compensation to immigration inspectors as provided by existing law. The court stated at page 53: "We know of no case in which any of the courts have held that a simple limitation on an appropriation bill of the use of funds has been held to suspend a statutory obligation." And at pages 50 and 51:

> * * * The Ball proviso was a mere limitation on the expenditure of a particular fund and had no other effect. For more than half a century according to the rules and the practice prevailing in the Congress, a pure limitation on an appropriation bill does not have the effect of either repealing or even suspending an existing statutory obligation any more than the failure to pay a note in the year in which it was due would cancel the obligation stipulated in the note. * * * Frequently, of course, under the guise of a limitation, a member would undertake to hide a provision which would also suspend or repeal the obligation, but the uniform rule was that if it were simply a withholding of funds

and not a legislative provision under the guise of a withholding of funds it had no effect whatever on the legal obligation. The usual form of a simple limitation was that none of the funds provided should be used for a specific purpose—naming the purpose. I know of no departure from this rule in the enactment of legislation in the history of the Government.[6]

The limiting language in the appropriation proviso in the *Dickerson* case would then be, in the words of the *Gibney* opinion, supra, "a legislative provision under the guise of a withholding of funds" which suspended the legal obligation, rather than a simple withholding of funds unaccompanied by other expressed or implied purposes. If the purpose of the limiting language in the appropriation under consideration in the instant case was to suspend or amend section 406(c) of the Federal Aviation Act of 1958, it was not so expressed by statute. Any proof of congressional intention to the contrary in the legislative history must be clear and uncontradicted to lift it from the ruling in the *Gibney* case and place it within the ambit of *Dickerson*.

Without question the House of Representatives intended to gradually eliminate helicopter subsidies from appropriations. Annual appropriations for that purpose from 1962 to 1965 were successively reduced in size from $6,000,000 to a final $3,358,000. The statement of the House Managers accompanying the conference report on the 1965 Appropriation Act (House Report No. 1781, 88th Cong., 2d Sess. 13 (1964)) stated that the helicopter subsidy there proposed was to be "the last money to be recommended by the Committee for these projects exclusively", and the Board was requested to exclude such items in its next budget requests. An intransigent House induced a reluctant Senate into excluding from the Second Supplemental Appropriation Bill for 1965 additional funds requested by the Board for helicopter subsidies, al-

---

6. The author of this opinion, then Chief Judge Marvin Jones, was for many years a distinguished Member of Congress and an authority on legislative procedure.

though the Congress did make a supplemental appropriation for the Board to meet its subsidy commitments for non-helicopter carriers. The fact that in fiscal 1963 Congress appropriated supplemental funds to pay subsidies due under the Board's rate orders does not advantage plaintiffs, for there were enough funds in the regular appropriation for that year to pay the helicopter subsidies set by the Board.

Despite these indications of congressional intention to curtail and finally eliminate helicopter subsidies, it is equally manifest that throughout the years in question the key congressmen who spoke on the subject fully understood that the commitment to pay subsidy compensation decreed by the Board for helicopter carriers was a binding obligation of the Government in the courts even in the failure of Congress to appropriate the necessary funds. See statements by Representative Michel, 111 Cong.Rec. 8557 (April 29, 1965), Senator Kuchel, 111 Cong.Rec. 8253 (April 27, 1965), Senator Javits, 111 Cong.Rec. 8685 (April 29, 1965), Senator Magnuson, 107 Cong.Rec. 14139 (1961), 108 Cong.Rec. 18331 (1962), 110 Cong.Rec. 18125 (1964), Representative Keogh, 111 Cong.Rec. 8553 (April 29, 1965), Representative Rooney, 111 Cong.Rec. 8553 (April 29, 1965), Representative Mahon, 111 Cong.Rec. 8554 (April 29, 1965). It is readily apparent from these remarks that in curtailing the subsidy appropriations for helicopter carriers Congress was well-aware that the obligation to pay the subsidy rates set by the Board could not be eliminated without changing section 406 of the Federal Aviation Act of 1958. The right of the carriers to resort to the Court of Claims for recovery was recognized. Significantly, the defendant has not countered this evidence of congressional misgivings.

The Board has repeatedly advised the appropriation committees of Congress at hearings on annual appropriations for helicopter subsidies from 1962 through 1965 that limitations on appropriations for helicopter subsidies would not, in the opinion of the Board's counsel, constitute an amendment or modification of section 406 of the Act, and that helicopter airlines entitled to the subsidies set by the Board could recover any deficiencies under the appropriations by suit in the Court of Claims. The Board has voiced these same views in its opinions fixing helicopter subsidy rates for periods beginning in 1962.

The defendant additionally contends that the plaintiffs' position is based on a theory of contract right, while neither the certificate under which the plaintiff operated nor the Act elsewhere gives rise to a contractual obligation on the part of the Government to pay a subsidy to helicopter carriers. Unlike the Merchant Marine Act of 1936, 46 U.S.C. § 1101, et seq., which specifically authorizes the execution of long-term contracts to provide Federal subsidization of merchant shipping operations, neither the Federal Aviation Act of 1958 nor its Civil Aeronautics Act predecessor provides for such contracts with the carriers, although prior to 1938 mail was carried by airlines under contracts. Therefore, argues the defendant, at the most the plaintiffs could have a contract implied in law which lies beyond this court's jurisdiction, citing Merritt v. United States, 267 U.S. 338, 45 S.Ct. 278, 69 L.Ed. 643 (1925) and J. C. Pitman & Sons, Inc. v. United States, 317 F.2d 366, 161 Ct.Cl. 701 (1963).

■ The actions of the parties support the existence of a contract at least implied in fact. The Board's rate order was, in substance, an offer by the Government to pay the plaintiffs a stipulated compensation for the transportation of mail, and the actual transportation of the mail was the plaintiffs' acceptance of that offer. No formal contract document was required to support the existence of the contract so implied. The same order established the rate of subsidy to be paid plaintiffs. Thus, from a contract standpoint, the transportation of mail by the carrier provided the consideration for both the service and subsidy elements of the compensation which became enforce-

able on performance of the services. That Congress recognized the contract nature of the subsidy payments is inferred by the title "Payments to Air Carriers (Liquidation of Contract Authorization)", which was given to the subsidy appropriations in both the Independent Offices Appropriation Act and the Second Supplemental Appropriation Act for fiscal 1965.

Aycock-Lindsey Corp. v. United States, 171 F.2d 518 (C.A. 5, 1948) supports the carriers' view of the contract relationship. There the plaintiff sought to recover subsidy payments under the Soil Conservation and Domestic Allotment Act, 16 U.S.C. §§ 590a through 590q–1 for carrying out certain conservation practices. In reversing the district court, which had dismissed the complaint for lack of jurisdiction under the Tucker Act because it was deemed not to be based on a contract, the circuit court found that an implied contract existed because the plaintiff had satisfied the requirements to receive the payments, so that they were not gratuities but were compensatory in nature. The mail transportation services rendered by the plaintiffs in the present cases constitute an equivalent compliance with a rate order entitling them to receive subsidy payments, thus establishing an implied contract of at least equal validity. Whether the obligation to transport mail is derived from express contract with the Government, as in Seatrain Lines, Inc. v. United States, 99 Ct. Cl. 272 (1943), or by statute, as also in the instant case and in New York Central R. R. v. United States, 65 Ct.Cl. 115 (1928), aff'd, 279 U.S. 73, 49 S.Ct. 260, 73 L.Ed. 619 (1929), the failure of Congress or an agency to appropriate or make available sufficient funds does not repudiate the obligation; it merely bars the accounting agents of the Government from disbursing funds and forces the carrier to a recovery in the Court of Claims. In the latter case the statute required the carrier to transport such mail as was offered for transportation by the Government, with severe penalties for refusal, just as in the present case plaintiffs' refusal to transport mail at the direction of the Postmaster General would have jeopardized their certifications, and the court deemed that to be an important consideration in determining the carrier's right to a judgment for its reasonable compensation which had been denied by the Interstate Commerce Commission.

■ The defendant finally relies on 31 U.S.C. § 665(a) to make invalid the contract created with plaintiff by the Board's rate order. The statute provides:

(a) Expenditures or contract obligations in excess of funds prohibited.

No officer or employee of the United States shall make or authorize an expenditure from or create or authorize an obligation under any appropriation or fund in excess of the amount available therein; nor shall any such officer or employee involve the Government in any contract or other obligation, for the payment of money for any purpose, * * * *unless such contract or obligation is authorized by law.* [Emphasis supplied.]

Since it has been found that the Board's action created a "contract or obligation [which] is authorized by law", obviously the statute has no application to the present situation, unlike the case in City of Los Angeles v. United States, 68 F.Supp. 974, 107 Ct.Cl. 315 (1946), where the contract between the plaintiff and the Department of the Interior had no statutory authorization and was thus invalid.

Accordingly, the plaintiffs' motions for summary judgment are granted, and the defendant's cross-motions for summary judgment are denied. Judgment is entered for plaintiff New York Airways, Inc. in the amount of $94,377.26, for plaintiff Los Angeles Airways, Inc. in the amount of $346,140.29, and for plaintiff Chicago Helicopter Airways, Inc. in the amount of $173,071.80.