**DISTRICT OF COLUMBIA, Appellant,**

v.

**POTOMAC ELECTRIC POWER COMPANY, Appellee.**

No. 13493.

District of Columbia Court of Appeals.

Argued Jan. 17, 1979.

Decided May 30, 1979.

David P. Sutton, Asst. Corp. Counsel, Washington, D.C., with whom Louis P. Robbins, Acting Corp. Counsel, and Richard W. Barton, Deputy Corp. Counsel, Washington, D.C., were on brief, for appellant.

Stephen A. Trimble, Washington, D.C., with whom Nicholas D. Ward, Washington, D.C., was on brief, for appellee.

Richard Littell, Scott M. DuBoff, and William W. Osborne, Jr., Washington, D.C., were on brief, for amicus curiae, the Public Service Com'm of the District of Columbia.

Before KERN, HARRIS and FERREN, Associate Judges.

HARRIS, Associate Judge:

The District of Columbia appeals from the trial court's grant of summary judgment in favor of Potomac Electric Power Company (Pepco) for $2,564,179.55, plus interest, owed by the District on past-due electricity bills. The Public Service Commission of the District of Columbia, before us as an amicus curiae, supports the ruling of the trial court. We affirm.

I

The central focus of the controversy is upon the relationship between two potentially conflicting congressional enactments. One is an apparent appropriations limitation on the amount of money which the District of Columbia may expend for street lighting. The other is the legislative plan which created the Public Service Commission of the District of Columbia (the PSC) and empowered it to set utility rates—including those charged for street lighting. In an attempt to add clarity to our later discussion, we first sketch the legislative evolution of both the limitation and the public utilities title (Title 43) of the District of Columbia Code.

Prior to the establishment of the PSC, Congress fixed utility rates in the District of Columbia. Those rates were set forth in annual appropriations acts for the city. For example, the District of Columbia Appropriations Act for 1913, Pub.L.No. 201, 37 Stat. 139 (June 26, 1912), delineated specific maximum annual rates for various types of existing lighting. It also provided that rates for additional forms of electric lighting could not exceed the total of 11 percent of their cost, a "fair sum" for their maintenance, and electricity at a rate not in excess of three cents per kilowatt-hour (KWH). *Id.,* at 181–84.

In 1913, however, Congress quit the business of rate-making. It then created the PSC (then named the Public Utilities Commission). In so doing, Congress developed a comprehensive regulatory scheme giving the PSC seemingly plenary authority to set, investigate, and enforce rates for utilities operating within the District. *See* District

of Columbia Appropriations Act for 1914, Pub.L.No. 435, § 8, 37 Stat. 938, 974–96 (Mar. 4, 1913) (codified in D.C.Code 1973, § 43–101 et seq.). In order to provide the fledgling commission with a starting point from which to begin its regulating, Congress froze the rates which utilities could charge at the levels at which they existed on March 4, 1913. Thereafter, changes in rates would be effectuated by the Commission after proper application and hearing. See D.C.Code 1973, § 43–401.[1] Such new rates were (and are) to be "reasonable, just, and nondiscriminatory." Every unjust or unreasonable or discriminatory charge was declared unlawful. See id., §§ 43–301, –401; D.C.Code 1978 Supp., § 43–201a.

Having thus removed itself from the ratemaking process, Congress simultaneously eliminated the street lighting rates which it previously had promulgated annually in the District appropriations acts. In their stead Congress established spending limitations—i. e., maximum monetary amounts

that the District could disburse yearly for the "purchase, installation, and maintenance of public lamps, lamp-posts, [etc.]." Those amounts essentially followed the previous rate levels. See, e. g., Appropriations Act for 1914, supra, 37 Stat. at 952–53.[2] A similar limitation (generally varying only in amount) was carried forward in each successive appropriations act for the District until 1926.[3]

In that year, Congress modified the language of past street lighting limitations by the addition of a proviso restricting payment of funds for street lighting to 87½ percent of the rates previously established by law and by the Commission in accordance with law. It also restricted the payment for electricity for new forms of street lighting to two cents per KWH. Appropriations Act for 1927, Pub.L.No. 205, 44 Stat. 417, 430 (May 10, 1926). Similar, but more concise, types of limitations were used subsequent to fiscal 1927.[4]

1. This section, which still includes its reference to the March 4, 1913, date, provides in part:

First, unless the commission shall otherwise order, it shall be unlawful for any public utility within the District of Columbia to demand, collect, or receive a greater compensation for any service than the charge fixed on the lowest schedule of rates for the same service under the law in force on March 4, 1913; second, every public utility in the District of Columbia shall, within thirty days after March 4, 1913, file in the office of the commission copies of all schedules of rates and charges, including joint rates, in force on March 4, 1913; third, any public utility desiring to advance or discontinue any such rate or rates may make application to the commission in writing, stating the advance in or discontinuance of the rate or rates desired, giving the reasons for such advance or discontinuance; fourth, upon receiving such application the commission shall fix a time and place for hearing, and give such notice to interested parties as shall be proper and reasonable; if, after such hearing and investigation, the commission shall find that the change or discontinuance applied for is reasonable, fair, and just, it shall grant the application, either in whole or in part . . . . . .

2. The relevant provision of that act thus provided:

LIGHTING: For the purchase, installation, and maintenance of public lamps, lampposts, street designations, lanterns, and fixtures of all kinds on streets, avenues, roads,

alleys, and public spaces, and for all necessary expenses in connection therewith, including rental of stables and storerooms, this sum to be expended in accordance with the provisions of sections seven and eight of the Act making appropriations to provide for the expenses of the government of the District of Columbia for the fiscal year ended June thirteenth, nineteen hundred and twelve, approved March second, nineteen hundred and eleven, and with the provisions of the Act for the same purpose for the fiscal year ending June thirtieth, nineteen hundred and thirteen, approved June twenty-sixth, nineteen hundred and twelve, and other laws applicable thereto, livery and extra labor, $391,000.

3. From its inception in 1913 until 1926, the Commission ordered changes in the street lighting rates. None of those rates exceeded the maximums permitted to be paid by the respective appropriations acts. See District of Columbia Appropriations, 1958: Hearings on H.R. 6500 Before the Subcomm. on District of Columbia Appropriations of the House Comm. on Appropriations, 85th Cong. 1st Sess. 655 (1957) (Statement of Walter C. Fowler) (hereinafter Hearings).

4. For example, the District of Columbia Appropriations Act for 1957, Pub.L. No. 637, § 11, 70 Stat. 439, 453 (June 29, 1956), provided:

Appropriations in this Act shall not be available for the payment of rates for electric current for street lighting in excess of those

In the appropriations act for 1958, Congress altered the limitation to the form which has been followed to the present day. That is the form which directly concerns us now:

Appropriations in this Act shall not be available for payment of rates for electric current consumed for street lighting in excess of 2 cents per kilowatt-hour for current consumed.

*See, e. g.,* Appropriations Act for 1958, Pub.L. No. 85–61, § 9, 71 Stat. 192, 205 (June 27, 1957).

## II

In April of 1973, Pepco applied to the PSC for an increase in rates for electric service within the District. Following formal hearings (in which the District was represented), the PSC determined that under existing rate schedules Pepco did not have the opportunity to earn a fair rate of return. Accordingly, the Commission ordered Pepco to file revised rate schedules. Order No. 5614, Nov. 16, 1973. Pepco did this, and on December 3, 1973, the PSC approved the new rates (effective Dec. 8, 1973), finding them to be "just, reasonable, and non-discriminatory . . . ." Order No. 5617, Dec. 3, 1973.

As part of the new rate schedules, Pepco was required to charge agencies of the federal and municipal governments a base rate of two cents per KWH for standard streetlights. This rate, however, was subject to a "fuel adjustment clause" which would increase or decrease the base rate in direct relation to the fluctuation in Pepco's fule costs.[5] Although similar fuel adjustment clauses had been included in previous street lighting schedules, none had operated in conjunction with a base rate—two cents per KWH—which was set at the maximum amount allotted to be expended by the District under the annual appropriations acts.

Inevitably the outcome of the new schedule was that Pepco's first monthly bill to the District for street lighting exceeded two cents per KWH by the amount of the fuel adjustment charge—then $11,645.35. The District did not pay that additional amount, nor did it apply to the PSC for reconsideration of the rate order as it might have pursuant to D.C.Code 1973, § 43–704. Rather, relying on the appropriations limitation, the District maintained that it could legally pay only the base rate for street lighting, and nothing more. Thus, when Pepco thereafter would submit its monthly bills, the District would not pay any charge above two cents per KWH.

Consequently, in 1976, Pepco brought suit to collect the unpaid amounts.[6] The District defended by arguing that even though the street lighting rates were just, reasonable, and nondiscriminatory, the PSC was without jurisdiction to set any such rate in excess of the limitation contained in the relevant annual appropriations acts.[7] The material facts not being in dispute, both sides moved for summary judgment. On April 6, 1978, the trial court denied the District's cross-motion for summary judgment and granted Pepco's, awarding the utility the full amount of the unpaid bills

authorized to be paid in the fiscal year 1927, and payment for electric current for new forms of street lighting shall not exceed 2 cents per kilowatt-hour for current consumed.

5. The purpose of such clauses is to seek to maintain the approved rate of return for the utility. The clause in question provided:
ADJUSTMENT FOR CHANGES IN THE COST OF FUEL—The energy charge will be increased or decreased .00109 cent per kilowatt-hour for each one-tenth cent increase or decrease above or below 55.0 cents per million BTU in average cost of fossil fuels as burned in the Company's power plants and charged to its Fuel Expense Accounts 501

and 547. This adjustment will be based upon the average cost of fuel during the month preceding the billing month.

6. The fuel adjustment clause was removed from the street lighting schedule on December 16, 1976. PSC Order No. 5849, Dec. 16, 1976.

7. *See* District of Columbia Appropriations Act for 1977, Pub.L.No. 94–446, § 107, 90 Stat. 1490, 1494 (Oct. 1, 1976); Act for 1976, Pub. L.No. 94–333, § 6, 90 Stat. 785, 790–91 (June 30, 1976); Act for 1975, Pub.L.No. 93–405, § 6, 88 Stat. 822, 827 (Aug. 31, 1974); Act for 1974, Pub.L.No. 93–91, § 6, 87 Stat. 306, 309 (Aug. 14, 1973).

($2,564,179.55) plus interest at four percent from the due date of each bill. The court stated in part:

> Contrary to the assertion of the District of Columbia the Court concludes that Congress has granted the Public Service Commission exclusive, plenary jurisdiction to establish just, reasonable and nondiscriminatory rates for electricity consumed by the District of Columbia, including that used for street lighting purposes. D.C.Code [1973], § 43–101 *et seq.* The Court also concludes that the Commission properly exercised its jurisdiction when it established two cents per kilowatt hour plus a fuel cost adjustment formula as the just, reasonable and nondiscriminatory rate for street lighting current. The Court further concludes that Congress did not intend that its two cents per kilowatt hour spending limitation restrict plaintiff to an arbitrary rate which may or may not be reasonable. Had Congress intended to repeal or limit the jurisdiction of the Public Service Commission to set reasonable rates, Congress would have done so forthrightly and not by pursestring inference. The imposition of a spending limitation by Congress or the mere failure to appropriate funds, without further words modifying or repealing § 43–101 *et seq.*, expressly or by implication, does not in itself defeat the Government obligation authorized and fixed by the Public Service Commission.

We concur in the trial judge's reasoning. Before we discuss the merits, however, we address a threshold procedural question raised by Pepco.

## III

D.C.Code 1973, § 43–704, provides that any public utility, person, or corporation affected by any final order of the PSC may, within 30 days after publication of the order, file an application for reconsideration of the matters involved. It also states that no utility, person, or corporation "shall in any court urge or rely on any ground not . . . set forth" in such an application for reconsideration. Additionally, § 43–710 provides that the method of review of PSC orders set forth in § 43–704 (and the appellate review provisions D.C.Code 1973, §§ 43–705 and –706) "shall be exclusive."

Pepco contends that the combined effect of these statutory provisions is to preclude the District from challenging the PSC's 1973 order setting the subject street lighting rates. Specifically, Pepco argues that if the District was dissatisfied with the rates, it should have timely-petitioned for reconsideration of them pursuant to § 43–704 and asserted the appropriations limitation at that time. Absent such a petition, Pepco argues, the District cannot now rely on the appropriations act provisions.[8]

Developing a three-pronged rebuttal, the District maintains that its failure to seek reconsideration is of no import. First, it contends that the PSC's orders are void because they are in conflict with the appropriations provision—and, the District urges, if the orders are void they may be collaterally attacked in the Superior Court.[9] Second, the District points to the legislative history of §§ 43–704 and –710 and argues, quite persuasively, that the congressional impetus behind their enactment was a desire to end de novo review of the PSC's orders in the courts, but not to prohibit challenges of void orders.[10] Third, pressing

---

8. *See generally City of Tacoma v. Taxpayers of Tacoma,* 357 U.S. 320, 78 S.Ct. 1209, 2 L.Ed.2d 1345 (1958); *Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938); *United States v. Public Utilities Commission of District of Columbia,* 81 U.S.App. D.C. 237, 158 F.2d 533 (1946), *cert. denied,* 331 U.S. 816, 67 S.Ct. 1305, 91 L.Ed. 1835 (1947).

9. *See generally Hollis v. Kutz,* 255 U.S. 452, 41 S.Ct. 371, 65 L.Ed. 727 (1921); *Mykolin v. Consol. Edison Co. of New York,* 89 Misc.2d 193,

389 N.Y.S.2d 996 (1976); *In re Banks,* D.C. App., 306 A.2d 270 (1973); *Flavell v. Department of Welfare, City and County of Denver,* 144 Colo. 203, 355 P.2d 941 (1960).

10. A proponent of the adoption of the sections had stated:

> The purposes of the proposed bill are twofold—first, to strengthen the arm of the Public Utilities Commission in dealing with public-utility matters, and second, to eliminate

this latter argument, the District notes that Congress expressly provided for challenges to excessive charges in D.C.Code 1973, § 43–604, in which it provided (in a statute originally enacted in 1913):

> If it be alleged and established in an action brought in any court for the collection of any charge for gas or electricity that a price has been demanded in excess of that fixed by the commission or by statute no recovery shall be had therein, but the fact that such excessive charges have been made shall be a complete defense to such action.

■ We agree with the District's assertion that § 43–604 provides a means of review in this unusual instance. However, we do not agree that the PSC's order is void, and we do not find it necessary to resolve the question of whether the review provisions of D.C.Code 1973, § 43–701 *et seq.*, foreclose the District's substantive arguments in this case. Unlike the situations presented in the cases relied upon by Pepco, this matter is not in a classic collateral attack posture. That is, the District is not contesting an order of the PSC either belatedly or in the wrong forum. Rather, it is asserting a statutory appropriations limitation as a defense to a civil action for the nonpayment of money. That being the nature of the action, the Superior Court had jurisdiction to entertain Pepco's suit.[11] Thus, the question becomes whether the District validly may assert the appropriations measure as a defense.

Section 43–604 of the Code provides that if it is alleged and established that a charge for electricity has been made in excess of a price which has been fixed by the Commission or by statute, then no recovery shall be had. This provision is directed to the situation in which a utility has charged a rate higher than that prescribed by the PSC. However, because of the peculiar circumstances involved here, the provision also is applicable to this case.

As this appeal demonstrates, the annual appropriations act is arguably a statute fixing a price above which the utility may not charge the District for electricity. Therefore, the District could "allege" it as a defense to the action within the meaning of § 43–604. Whether the District could "establish" it as a defense is, of course, another matter. That—as well as Pepco's right to recover—requires initial resolution by the trial court of the substantive issue of whether the appropriations act is a limit on the jurisdiction of the PSC to set rates. If it is, then the District is not liable for the fuel adjustment arrearages. If it is not such a limit, then the District is accountable for the full amount—as the Superior Court found it to be. It is to the merits of that ruling that we now turn.

### IV

■ Although it is not a favored procedure, Congress may amend or repeal substantive legislation by an appropriations act. *See, e. g., City of Los Angeles v. Adams,* 181 U.S.App.D.C. 163, 171–72, 556 F.2d 40, 48–49 (1977); *New York Airways, Inc. v. United States,* 369 F.2d 743, 749, 177 Ct.Cl. 800 (1966). However, such an amendment will not readily be inferred absent

---

the excessive delay caused by the present system of retrying in the courts every appeal case. Under the provisions of the present law, when the Commission acts and there is an appeal, the review is a legislative or administrative review and as such the court sits in such cases in its legislative capacity rather than as a constitutional court. As such, new evidence can be introduced, new findings of fact and conclusions arrived at by the court, the same as can be made by the Commission in the first instance. This causes delay, extra expense, and confusion. In addition, the Utilities can independently commence an injunction action. The bill proposed here provides for one review, a judicial review by the courts. All evidence must be introduced before the Commission and its findings of fact are conclusive if supported by substantial evidence, unless it shall appear that such findings of the Commission are arbitrary or capricious. [79 Cong.Rec. 6171 (1935).]

11. All parties agree that Pepco is obligated to provide the District with electricity. Thus we need not consider whether the obligation is one founded upon an implied contract based on the PSC statutes or one grounded in quantum meruit, for it is undisputed that Pepco has a right to sue in the Superior Court for breach of the obligation, however it may be styled.

manifest evidence that Congress intended an amendment. *New York Airways, Inc. v. United States, supra,* at 749. Without such evidence, a pure appropriations limitation will serve its obvious purpose of preventing the immediate disbursement of funds, but it will not defeat an obligation created by underlying substantive legislation. *Id.,* at 748; *see also Norcross v. United States,* 142 Ct.Cl. 763, 768–69 (1958); *Gibney v. United States,* 114 Ct.Cl. 38, 50–51 (1949).

■ The underlying legislation in this case is Title 43 of the D.C.Code. As noted, that title is a broad legislative scheme giving the PSC unqualified authority to fix and maintain "reasonable, just and non-discriminatory" rates for electric service. D.C. Code 1973, §§ 43–301, –401; D.C.Code 1978 Supp., § 43–201a. Therefore, if a rate has been properly promulgated by the PSC and is reasonable, just and nondiscriminatory (as is the one here), then the utility must charge that rate. *Ibid.* Correspondingly, the consumer must pay that amount unless there is a valid defense to such a charge. The defense which the District claims is that the appropriations limitation prohibits the PSC from fixing a rate in excess of two cents per KWH to the District for street lighting. If the limitation is to have that effect, it necessarily would have to be because it amended the authority of the PSC to set reasonable rates.

Such an amendment certainly was not effectuated as a result of the plain language of the appropriations measures. To reiterate, one example of the limitation provides:

> Appropriations in this title shall not be available for the payment of rates for electric current for street lighting in excess of 2 cents per kilowatt-hour for current consumed. [Pub.L. 94–446, § 107, 90 Stat. 1494 (1976).]

On its face that would seem to mean what it says, that is, the District may not use any of the moneys appropriated to it by Congress to pay for street lighting at a rate above two cents per KWH. Put another way, the disbursing officer for the District may not use any of the congressionally appropriated sums to pay for street lighting at rates in excess of two cents per KWH. However, that language may not be transformed to mean that the PSC may not set a street lighting rate in excess of two cents per KWH.[12]

The District, however, would have us infer that meaning from the history of the legislation. Initially, the District maintains that we must consider the fact that the Act which established the first appropriations limitation for street lighting also created the PSC and its authority. Appropriations Act for 1914, *supra.* Therefore, the District argues, it was Congress' intent to have the "specific" street lighting provisions take precedence over the PSC's "general" rate-making provisions. *See generally Ginsberg & Sons v. Popkin,* 285 U.S. 204, 208, 52 S.Ct. 322, 76 L.Ed. 704 (1932); *Goodwin v. District of Columbia Board of Education,* D.C. App., 343 A.2d 63, 66 (1975). This contention, however, is not borne out by the structure of the 1914 Act.

A study of that Act indicates that Congress first set out all the appropriations necessary for the city's operation for the upcoming fiscal year. This was done in an orderly fashion, with Congress setting out headings (*e. g.,* General Expenses, Sewers, Streets) and then, under each heading, allotting specific sums of money for specific uses. In the middle of this, under the heading "Electrical Department," fell the sub-

---

12. It is interesting to note that when Congress has sought to limit the authority of the PSC to act, via an appropriations measure, it has done so explicitly. For example, language similar to the following has been contained in various appropriations acts:

> Sec. 106. Appropriations in this title shall not be used for or in connection with the preparation, issuance, publication, or enforcement of any regulation or order of the Public Service Commission requiring the installation of meters in taxicabs, or for or in connection with the licensing of any vehicle to be operated as a taxicab except for operation in accordance with such system of uniform zones and rates and regulations applicable thereto as shall have been prescribed by the Public Service Commission. [District of Columbia Appropriations Act for 1977, *supra,* 90 Stat. 1494.]

ject appropriation limitation, among allocations for such as the salaries of electrical engineers and sums for fire alarm boxes.[13] The allocations then continued under numerous headings. Once an enumeration of all appropriations necessary to the District as completed, the format completely changed. The Act continued on to establish the Commission and empower it to set rates, substantially in the same form as does the present Title 43.[14]

That structure demonstrates that within one act Congress contemplated two totally different legislative goals. One was to provide all of the necessary appropriations for the functioning of the city. The other was to establish and empower a regulatory agency. There is no indication that the lighting limitation was intended to affect the agency at all. That both were set forth in the same Act indicates only that Congress was engaged in an act of legislative economy—enacting all laws affecting the city at the same time. Additionally, aside from being expedient, it was logical that Congress would create a regulatory body in the appropriations act, for funds to establish and organize the agency had to be appropriated.

More importantly, the District's argument does not squarely address the point that it is not the 1914 appropriations limitation with which we are here concerned. Rather, it is the one which was established for fiscal 1958 and which has been carried forward to this date.[15] In that regard the District does not confront the fact that the Congress which established the two cents per KWH limitation in issue today did so at the behest of the District of Columbia government and did so to clarify and preserve the plenary jurisdiction of the PSC to set rates.

At the hearings before the House of Representatives' Subcommittee on District of Columbia Appropriations for fiscal 1958, the District asked Congress to revise the language of prior street lighting limitations to the present form.[16] The city's stated purposes for requesting the changes were:

1. To remove any possible conflicts between the rates established by the Public Utilities Commission and the limitations heretofore contained in the District appropriation acts, and

2. To remove any questions whatsoever as to whether the limitations impinge—directly or indirectly—upon the statutory congressionally delegated rate-making powers of the Public Utilities Commission.

The changes in language recommended by the Commissioners are not only desirable but essential if the Public Utilities Commission is to have unquestioned authority and responsibility, as Congress intended, for the establishment of fair and equitable rates for street-lighting services.

\* \* \* \* \* \*

In short, the restrictions contained in previous District of Columbia appropriation acts upon payments by the District of

---

13. For the specific wording of the limitation, *see* note 2, *supra.*

14. Following the provisions which established the Commission, Congress, in similar fashion, established an "Excise" board to license saloons and barrooms.

15. *This is highlighted by the fact that Congress* reenacted and rearticulated the function of the PSC in 1973, as part of the District of Columbia Self-Government and Governmental Reorganization Act. That Act did not contain or refer to any appropriations limitation on street lighting: *Function of Commission—Unjust, Unreasonable, or Discriminating Charge Prohibited.* There shall be a Public Service Commission whose function shall be to insure that

every public utility doing business within the District of Columbia is required to furnish service and facilities reasonably safe and adequate and in all respects just and reasonable. The charge made by any such public utility for any facility or services furnished, or rendered, or to be furnished or rendered, shall be reasonable, just, and nondiscriminatory. Every unjust or unreasonable or discriminating charge for such facility or service is prohibited and is hereby declared unlawful. [Act of Dec. 24, 1973, Pub.L.No. 93–198, § 493(a), 87 Stat. 811, now codified in D.C.Code 1978 Supp., § 43–201a.]

16. *See* note 4, *supra.*

Columbia government for street-lighting service should be permanently removed from the District of Columbia Appropriation Act, and the payments should be in accordance with rates established as just and reasonable by the Public Utilities Commission. Admittedly, the existing restrictions are not direct derogations of the Commission's statutory power to fix and establish fair and reasonable rates for street-lighting services to the District of Columbia. However, it is totally unrealistic to believe that the existence of the restrictions does not at least cloud the ability of the Commission to subject street-lighting service rates to the same tests of fairness and reasonableness to which all other rates are subjected. [*Hearings, supra* note 3, at 655, 656.] The reason why the flat two cents per KWH limitation was expected to eliminate "possible conflicts" was because at the time the rate for street lighting was 1.35 cents per KWH, and no one then foresaw its climbing above two cents per KWH. *Hearings, supra,* at 655.

Undaunted by this adverse history, the District asserts that other, more recent legislative statements support its contentions. It is important to note at this juncture that Congress was aware of the precise problem involved here as early as the spring of 1975. In March of that year, Pepco advised the PSC of its intention to propose that Congress delete the spending limitation. Accordingly, in April of 1975, pursuant to its obligation under D.C.Code 1973, § 43–304, the PSC informed the House and Senate subcommittees on D.C. appropriations of its views on the subject. The PSC concurred in the District's opinion that the appropriations acts limited "the amount which the District can pay to a flat two cents." The Commission also stated, however, that:

It is our view that the public interest will be served by elimination of the limiting language from future Appropriations Acts. We reach this determination in the interest of clarification of this Commission's jurisdiction over utility rates. We believe it is the intent of the Congress that the Commission's jurisdiction in this area be exclusive and plenary, a matter that has been called into question as a result of the restraints imposed upon the District Government by the . . . language which has appeared in recent Appropriations Acts.

The Commission concluded:

The Pepco letter also requests that the Fiscal '76 Appropriations Act include the funds necessary to satisfy the accrued unpaid street lighting bills for past years. While the Commission is of the view that these amounts due the Company from the District Government are appropriate and should be paid, we take no position on the method adopted to satisfy the outstanding obligations.[17] We are, however, constrained to point out that one element of any utility's cost of service is the financial loss that occurs from unpaid bills. If the District's bills are not paid, we will certainly be requested to recognize the substantial increase in uncollectibles in setting future rates for all customers.

Yet, despite this knowledge the congressional declarations singled out by the District as favorable to its position indicate only that Congress believed the street lighting limits to be limits on the ability of the District to disburse appropriated funds.[18] The debates and reports are devoid of any reference to or inference about the jurisdiction of the PSC. Indeed, if these congressional discussions evoke any inference it is

17. We also take no position concerning the source of funds from which the District's obligation to Pepco should be satisfied.

18. For fiscal 1977, *see* H.R.Rep.No. 94–1415, 94th Cong. 2d Sess. at 33 (1976); S.Rep.No. 94–1167, 94th Cong. 2d Sess. at 39 (1976); H.R.Conf.Rep.No. 94–1500, 94th Cong. 2d Sess. at 2 (1976), U.S.Code Cong. & Admin.News 1976, p. 1490.

For fiscal 1976, *see* H.R.Rep.No. 94–1185, 94th Cong. 2d Sess. at 38 (1976); S.Rep.No. 94–943, 94th Cong. 2d Sess. at 35 (1976); H.R. Conf.Rep.No. 94–1293, 94th Cong. 2d Sess. at 7 (1976); 122 Cong.Rec. 10950 (1976) (Remarks of Sen. Chiles), U.S.Code Cong. & Admin.News 1976, p. 785.

that the House of Representatives was merely being intransigent with the appropriation of funds and was well aware that the courts in this case were likely to rule that the appropriations limitations did not negate the District's overriding obligation to pay rates in excess of two cents per KWH.[19]

█ In sum, nothing on the face of the enactments or in their legislative history demonstrates that the appropriations act language was meant to be anything other than a ceiling on the appropriated amount the city could expend for street lighting. Necessarily then, the acts cannot be construed to affect the jurisdiction of the PSC.

## V

Case law supports the validity of these conclusions. The case most closely analogous to this one is that upon which the trial judge relied—*New York Airways, Inc. v. United States, supra.* In that case, the Court of Claims was concerned with the relationship between two sections of the Federal Aviation Act of 1958. Section 406(a) thereof, 49 U.S.C. § 1376(a) (1960), empowered the Civil Aeronautics Board (CAB) to "fix and determine . . . fair and reasonable rates of compensation for the transportation of mail by aircraft." This compensation included a "service" element and a "subsidy" element. Section 406(c), 49 U.S.C. § 1376(c) (1960), provided that the subsidy portion was to be paid by the CAB "out of appropriations made to [it] for that purpose."

Over a period of years, the CAB fixed compensation for helicopter mail carriers. That compensation, however, exceeded the amounts appropriated by Congress for payment under § 406(c). Unlike our case, Congress had successively reduced the helicopter subsidy appropriations "making it clear that it did not want the budgeted amounts to be exceeded." 369 F.2d at 747. As a result, certain carriers did not receive full payment, and they sued for the arrearages. Thus, the Court of Claims was confronted with the precise issues involved here, namely, whether the appropriations limitations abrogated the government's obligations to pay the carriers and amended the CAB's authority under the Federal Aviation Act to set reasonable rates. The court held that they did not.

The court reached that conclusion by reviewing both the plain language and the legislative history of the relevant provisions. The former indicated that the CAB's duty to fix and determine reasonable rates of compensation was not conditioned upon the existence or adequacy of congressional appropriations. *Id.*, at 746. The latter demonstrated (1) that the CAB had informed Congress that in its opinion the appropriations limitation had no effect on either the obligation of the government to pay the sums owed or on the authority of the Board to promulgate fair and reasonable rates of compensation; and (2) that there was no congressional expression of a contrary interpretation. *Id.*, at 747 and 751. Accordingly, since there was nothing indicating either "expressly or by clear implication," *id.*, at 748, that Congress intend-

---

**19.** Reporting to the Senate on the Conference Report of the 1977 Appropriations Act, Senator Chiles, Chairman of the Senate Subcommittee on D.C. Appropriations, stated:

[T]he conferees discussed the merits of eliminating the 2 cents per kilowatt-hour limitations on the amount that the city can pay Potomac Electric Power Co.—Pepco—for street lighting in the city. While the D.C. appropriations bill has included a limitation on the amount that the city can pay Pepco for street lighting since 1912, the limitation until last year was always higher than the actual charge and the city has therefore always been able to pay its bills. The dramatic

fourfold increase in energy prices since the Arab embargo in 1973 has rendered the 2 cents per kilowatt-hour limitation outmoded. Pepco has filed suit to recover past amounts due to it from the city, but which the city could not pay because of the limitation. The House argued for the continuation of the 2 cents per kilowatt-hour limitation. The House indicated that it would reconsider its position on the item during consideration of the 1978 budget based on the outcome of the pending court case. Based on this understanding, the Senate receded to the House on this item. [122 Cong.Rec. 16265 (Sept. 21, 1976).]

ed an amendment of the substantive law by the appropriations measure, the court required the government to pay the arrearages.

A parallel set of circumstances exists in this case. First, the plain language of the appropriations limitations does not alter the authority of the PSC to set rates. Second, both the PSC and the District have maintained before Congress that the appropriations limitations do not alter the substantive powers of the PSC to set rates. Third, there is no evidence of a contrary legislative intent.

The District, however, would have us distinguish *New York Airways'* applicability, primarily on the ground that in our case Congress placed the specific rate limitation in the same overall enactment as that which created the PSC. We have discussed the lack of merit to this argument. Additionally, we would note that if such a statutory structure were a keystone of substantive amendment, then the limitation at issue in *New York Airways* would be more likely to have been found to be an amendment, since the very same section (as opposed to the same enactment) that granted the CAB power to set rates also required the payment of those rates to be made out of available appropriations. Nevertheless, because of the language and history of the section, the Court of Claims found no amendment.[20]

Correspondingly, we see no reason why the reasoning of *City of Los Angeles v. Adams, supra,* would affect our result, as the District contends it should. It is true that in *Adams* the circuit court concluded that an appropriations measure did limit an earlier enactment. However, the analysis employed by the court in that case is the

same as we use here. That is, the court looked to both the plain meaning and the legislative history of the pertinent measures in order to detect congressional intent to amend the existing legislation. 181 U.S. App.D.C. at 170, 556 F.2d at 47. Looking to those factors in the context of that case, it was unquestionable that the particular appropriations limits were limitations on the grants-in-aid (the underlying legislation), and that Congress had repeatedly expressly said so. *Id.,* at 170–71, 556 F.2d at 47–48. Were we presented with such facts and circumstances in this case, we too might find a limitation. However, we are not and we do not.

Rather, we agree with the conclusions of the trial court. The two cents per KWH limitation does not affect the plenary jurisdiction of the PSC to establish just, reasonable, and nondiscriminatory rates, nor does it relieve the District of its obligation to pay Pepco the full amount due under the admittedly just, reasonable, and nondiscriminatory rates which have been authorized by the PSC. Accordingly, we affirm the Superior Court's grant of summary judgment in favor of Pepco in the amount of $2,564,179.55.[21]

## VI

This leaves only the question of whether the court properly awarded Pepco interest at the rate of four percent computed from the date each monthly payment for street lighting fell due. The applicable statute, D.C.Code 1973, § 15–108, provides:

> In an action in the United States District Court for the District of Columbia or the Superior Court of the District of Columbia to recover a liquidated debt on which interest is payable by contract or

20. Similarly, the District maintains that *New York Airways* is distinguishable because there was an "antecedent obligation" involved there as opposed to this case. Although the District does not clearly explain what that obligation was or how it would alter our resolution of the case, we assume it is referring to the CAB's practice of issuing rate orders prior to the enactment of § 406 with its appropriation limit. *New York Airways, supra,* at 748. In any

event, whatever "antecedent" might mean to the District, the sums in issue in *New York Airways* were due as a result of the CAB's promulgating rates pursuant to § 406, and thus there were no obligations in question created "antecedent" to the appropriations limitation. *See id.,* at 744.

21. As a result of this holding, we need not reach Pepco's constitutional arguments.

by law or usage the judgment for the plaintiff shall include interest on the principal debt from the time when it was due and payable, at the rate fixed by the contract, if any, until paid.

The District does not contend that the sum due is not a liquidated debt. Instead, the city maintains that § 15–108 should be construed equitably so as not to "impose a penalty on an innocent defendant." The District's logic is that because the appropriations limitation foreclosed it from making the fuel adjustment payments to Pepco, it was without fault in withholding the money and therefore should not be "penalized" by the assessment of interest. Although this argument is superficially appealing, it fails to recognize both the purpose of allowing prejudgment interest on a debt, and the plain mandate of the statute.

 Interest is not imposed on a debtor's obligation in order to exact a penalty. It is imposed to compensate the creditor for the loss of the use of its money. *United States v. United Drill & Tool Corp.*, 87 U.S.App. D.C. 236, 237, 183 F.2d 998, 999 (1950). Regardless of fault or innocence on the part of the District, Pepco was without the use of the sums here from the days on which they fell due, with the District correspondingly having the use of such funds.

Moreover, § 15–108 allows little, if any, room for weighing equities. It states that the judgment "shall include interest" from the time the debt was due and payable. Thus if a debt is a liquidated one which meets the requisites of § 15–108 (as does the one here), then prejudgment interest "shall" be awarded. *See Rosden v. Leuthold*, 107 U.S.App.D.C. 89, 92, 274 F.2d 747, 750 (1960). We thus conclude that the trial court properly awarded prejudgment interest. *See* D.C.Code 1973, § 28–3302.

*Affirmed.*