**WETSEL–OVIATT LUMBER COMPANY, INC.,**
**Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 96–323C.

United States Court of Federal Claims.

Aug. 12, 1997.

Alan I. Saltman, Saltman & Stevens (Gary G. Stevens and Kevin W. McArdle, of counsel), Washington, DC, for plaintiff.

Lance J. Lerman, Civil Division, Department of Justice (Leslie Lagomarcino, Lori Polin Jones, and Jeff Moulton, Office of General Counsel, United States Department of Agriculture, of counsel), Washington, DC, for defendant.

1. These four contracts are also relevant to a related case currently before this Court, *Wetsel–Oviatt Lumber Co., Inc. v. United States*, Fed. Cl.

## OPINION

MARGOLIS, Judge.

In this government contract action, currently before the Court on plaintiff's motion for summary judgment on the issue of liability, plaintiff challenges as a breach of contract the Forest Service's refusal to compensate plaintiff for timber deleted from two timber sale contracts, where the two contracts explicitly provide for compensation in the event of United States Forest Service modification or cancellation of the contracts. These two contracts are the Leek timber sale contract ("Leek contract") and the Barney timber sale contract ("Barney contract").

## FACTS

When the United States government, through the U.S. Forest Service, Department of Agriculture, determines to sell timber located on federal land, it usually does so by soliciting and receiving competitive bids for the right to cut and remove the timber. The plaintiff Wetsel–Oviatt Lumber Company, Inc. ("Wetsel"), as the high bidder, was awarded at least four of these contracts: (1) the Leek timber sale contract, Contract No. 054751 ("the Leek contract"); (2) the Barney timber sale contract, Contract No. 056855 ("the Barney contract"); (3) the Lyons timber sale contract, Contract No. 056806 ("the Lyons contract"); and (4) the Sawpit Cable timber sale contract, Contract No. 055550 ("the Sawpit contract").[1] These contracts (collectively "the four contracts") were awarded on September 16, 1987, August 25, 1992, November 16, 1989 and August 10, 1992, respectively.

Each of the four contracts obligate the Forest Service to sell, and Wetsel to cut and remove, specified amounts of timber. For the Leek and Barney contracts, the amount of timber was 9,310 thousand board feet ("MBF") and 5,350 MBF, respectively. Additionally, each of the four contracts contains a clause *"C8.2–Termination."* There are, however, two versions of the clause. While the Sawpit and Leek contracts contain a May

No. 94–389C, in which Wetsel argues that the government's suspension of the four contracts breached those contracts.

1984 version of the clause; the Lyons and Barney contracts contain a December 1989 version of the clause. Both versions, though not identical, are similar in substance and provide that, in certain circumstances, the Chief of the Forest Service may terminate the contracts for environmental reasons. In this regard, all four contracts contain an October 1977 version of clause "*C9.5–Settlement*," which limits the liability of the United States in the event of a termination under clause C8.2. The Barney, Sawpit, and Lyons contracts also contain clause "*C9.52–Settlement*," which further limits the United States' liability in the event of a modification or termination of the contract and provides for permissible modifications to the contract.

All four contracts originally stipulated a termination date that has since been extended. The Leek contract originally had a termination date of December 31, 1990, but contract modifications have extended that termination date until October 15, 1997. The Barney contract originally referenced a termination date of December 31, 1993, but contract modifications have likewise extended that contract termination date until October 15, 1997. Originally set to be terminated on December 31, 1993, contract modifications have extended the Lyons contract until October 17, 1997. Finally, the Sawpit contract originally had a termination date of December 31, 1992, but that date has been extended by modification until October 31, 1997.

By letter dated May 14, 1993, the Forest Service Contracting Officer ("Contracting Officer") communicated to Wetsel that the Barney, Leek, Lyons, and Sawpit Cable timber contracts were suspended pending Forest Service review of the sales in light of new environmental assessments being completed, and until notification by the Contracting Officer to Wetsel that operations could proceed. Environmental review of the Sawpit sale concluded on May 3, 1995 when Supervisor John Phipps of the Eldorado National Forest issued a Decision Notice deleting, for environmental reasons, portions of several units from the timber sale and imposing additional

harvesting restrictions on the remainder. In an Environmental Assessment accompanying the Decision Notice, Phipps estimated that the Notice deleted the timber available for harvest under the Sawpit contract by 706 MBF, or 18 percent.[2]

Environmental review of the Leek sale concluded on May 15, 1995, when Phipps issued a Decision Notice deleting, for environmental reasons, units 1–4, 6–8, 11–14, 16, 18–25, and 30–31 from the sale and imposing additional harvesting restrictions for environmental reasons. In an Environmental Assessment accompanying the Decision Notice, Phipps estimated that the Notice deleted the timber available for harvest under the Leek contract by 7,897 MBF, or 96 percent.

Environmental review of the Lyons sale also concluded on May 15, 1995, and Phipps likewise issued a Decision Notice deleting timber from the sale and imposing additional harvesting restrictions for environmental reasons. An Environmental Assessment accompanying the Decision Notice estimated reduction of the Lyons harvest by 1,328 MBF, or 53 percent.

Finally, review of the Barney sale concluded on May 22, 1995 when Phipps issued a Decision Notice deleting, for environmental reasons, units 1–3, 3a, 4–9, 11–12, 14–19, 20, 22, 30, and 36 from the sale and imposing additional harvesting restrictions on the sale for environmental reasons. An Environmental Assessment accompanying the Decision Notice estimated a resulting reduction in the timber available for harvest under the Barney contract of 4,223 MBF, or 79 percent.

By letters to the Contracting Officer, dated June 5, 1995, Wetsel requested that the Forest Service prepare, as soon as possible, proposed modifications to the four contracts reflecting the changes that would be made to the sales as the result of Phipps' Decision Notices. Thereafter, in a series of letters addressed to Regional Forester G. Lynn Sprague between June 21 and July 10, 1995, Wetsel appealed, pursuant to 36 C.F.R. § 215, Phipps' Decision Notices as they pertained to the four contracts.

---

2. The government contends that timber sale volumes for timber sales—particularly those derived from Environmental Assessments—are estimates rather than exact volumes, and that exact volumes can only be known once an individual sale is logged and scaled.

Part 215 of title 36 of the Code of Federal Regulations provides for "prompt administrative review of project and activities implementing forest service plans and establishes who may appeal decisions on planned actions, the kinds of decisions that may be appealed, the responsibilities of the participants in an appeal, and the procedures that apply." *See* 36 C.F.R. § 215.1. With regard to each appeal, Wetsel informed Sprague that Wetsel did not seek a stay of implementation of Phipps' decision pending resolution of Wetsel's appeal. By letter to Martha Zoe Tyler of the U.S. Forest Service, dated July 24, 1995, Wetsel reiterated its position stating: "Wetsel–Oviatt does not seek a stay of implementation and voluntarily waives all rights to a stay of implementation with respect to each of [its] appeals." The Forest Service acknowledged receipt of Wetsel's July 24 letter by letter dated July 28, 1995.

Subsequently, the Forest Service, through Appeal Deciding Officer James A. Lawrence, issued a series of decisions between August 7, 1995 and August 24, 1995 regarding Wetsel's appeal of Phipps' May 1995 decisions. With regard to the Sawpit, Leek, and Lyons sales, the Forest Service affirmed Phipps' decisions in their entirety. Regarding the Barney sale, however, the Forest Service affirmed all of Phipps' decision except Phipps' decision to delete units 1, 12, and 15. As to units 1, 12, and 15, the Appeal Deciding Officer instructed the Forest Supervisor to review the analysis for those units and issue a new decision.[3] Each of the Appeal Deciding Officer's Decisions purported to be the United States Department of Agriculture's final administrative determination with regard to the four contracts.

Thereafter, by letter dated October 12, 1995, Director of Timber Management David L. Hessel notified Wetsel that he was modifying the Lyons contract pursuant to contract provision C8.2, and reducing the contract volume. By letter dated October 13, 1995, Contracting Officer Craig Bodenhausen forwarded a modification of the Lyons contract to Wetsel. Bodenhausen's letter reflected changes made to the Lyons sale by Phipps' May 1995 decision. On October 24, 1995, the U.S. Treasury, at the direction of the Forest Service, issued a check to Wetsel in the amount of $66,800.47 constituting compensation due Wetsel pursuant to clause C9.5 for timber deleted from the Lyons contract.[4]

Modifications to the Sawpit sale were treated by the Forest service similarly. By letter dated December 19, 1995, Contracting Officer Bodenhausen forwarded to Wetsel a modification of the Sawpit contract reflecting changes made by Phipps' May 1995 Decision Notice and informing Wetsel that it would be compensated in the amount of $232,892.95 for the deletion of 589 MBF timber pursuant to clauses C8.2 and 9.5. Bodenhausen's December 19, 1995 letter also represented that the Chief of the Forest Service had approved deletion of 589 MBF from the Sawpit contract and that a letter from the Chief's office approving partial cancellation of the sale was enclosed. Enclosed was a letter from Director of Timber Management David L. Hessel stating that he was modifying the Sawpit contract and reducing contract volume for the sale pursuant to provision C8.2 of the contract. Sometime thereafter, the U.S. Treasury, at the direction of the Forest Service, issued Wetsel a check in the amount of $232,892.95, constituting compensation due Wetsel pursuant to clause C9.5 for the 589 MBF timber deleted from the Sawpit contract.

By letter dated November 3, 1995, counsel for Wetsel confirmed the November 2, 1995 telephone conversation and requested the Contracting Officer expedite completion of the proposed modification for the Leek and Barney sales. Notwithstanding the Novem-

---

3. On October 31, 1995, Phipps issued a new Decision Notice for the Barney sale that again deleted unit 15 from that sale, but reinstated units 1 and 12. The addition of units 1 and 12 was, however, subject to certain other environmentally based restrictions on the sale. Phipps' October 31, 1995 decision was not appealed. Reinstatement of units 1 and 12 to the timber sale brought the total timber available for harvest on the Barney sale to 1,192 MBF, or 78% less than the original contract volume of 5,350 MBF.

4. Additionally, by letter of December 8, 1995, the Contracting Officer informed Wetsel that the government had miscalculated and underestimated the amount due Wetsel for the Lyons modification by $4,737.34.

ber conversation between Wetsel and the Contracting Officer, by letter dated December 12, 1995, the Forest Service informed Wetsel that contract modifications implementing the decisions made in the revised Environmental Assessments for the Leek and Barney sales were still being prepared.

Not satisfied with the progression of events to that point Wetsel, by letters dated January 5, 1996, pursuant to the Contract Disputes Act ("CDA"), 41 U.S.C. § 605, submitted certified claims to the Contracting Officer for compensation allegedly due Wetsel for timber the Forest Service determined to delete from the Leek and Barney contracts. Based on the Forest Service's estimate of the amount due Wetsel for timber deleted, Wetsel claimed $1,997,000 on the Leek contract and $894,000 on the Barney contract. By letter dated March 1, 1996, Contracting Officer LaBoa acknowledged Forest Service receipt of Wetsel's claims on January 9, 1996, and stated that he would complete review and issue decisions on Wetsel's claims by May 24, 1996.

Contracting Officer LaBoa notified Wetsel, by letters dated April 19, 1996, that the environmental review of the Leek and Barney timber sales were complete and, further, that Forest Supervisor Phipps' decisions regarding environmental assessments for those sales had been affirmed by the Deciding Officer and could be implemented. In this regard, the Contracting Officer's letters informed Wetsel that operations in certain units of the Leek and Barney sales would have to remain suspended until a determination regarding modification of those units could be made in light of the Anti-Deficiency Act, 31 U.S.C. § 1341, and that, thereafter, Wetsel would be compensated for any deleted timber.[5] Additionally, Wetsel was granted contract term adjustments deferring the Leek and Barney contract termination dates until October 15, 1997.

Thereafter, on May 24, 1996, Contracting Officer LaBoa issued decisions on Wetsel's January 5, 1996 Leek and Barney contract claims. Declining Wetsel's application for

relief the Contracting Officer wrote that Wetsel would be compensated for any timber eventually deleted from the sales but that he was unable to "make a determination about modification of [the] units ... in light of the Anti-Deficiency Act."

Unsatisfied with this result, Wetsel, apparently, prompted Congressman John T. Doolittle, who represents the congressional district in which Wetsel is located, to inquire by letter to James R. Lyons, Undersecretary for Natural Resources and the Environment for the United States Department of Agriculture, dated April 3, 1996, as to why Wetsel had not been compensated approximately $3 million for the partial cancellation of the Leek and Barney sales. Lyons responded to Doolittle's communication by letter indicating that the Forest Service was, at that time, unable to resolve Wetsel's dispute because funds were unavailable. Still not satisfied with the Forest Service's response, Wetsel brought the present action on June 4, 1996.

## DISCUSSION

Wetsel alleges—and the government agrees—that the Forest Service has no intention of ever permitting Wetsel to harvest, in compliance with the Leek and Barney contracts, the timber Supervisor Phipps determined to delete from the Leek and Barney contracts. As defendant readily admits, "[u]pon completion of environmental analysis, the Forest Service usually releases timber, modifies the timber sale contracts, and pays the contractors amounts due for replacement value and out of pocket expenses." Indeed, the Forest Service seems to have followed this procedure with regard to the Lyons and Sawpit contracts and Wetsel has been compensated for timber deleted pursuant to Forest Service modification of those contracts.

Notwithstanding that the timber sold to Wetsel under the Leek and Barney sales will never be released to Wetsel pursuant to those contracts, the government argues that it has not breached the Leek and Barney contracts. The government advances two ar-

---

**5.** The Leek contract units referenced that would remain suspended were 1–4, 6–8, 11–14, 16, 18–25, 28, 30–31, and a portion of unit 26. Units to remain suspended in the Barney contract were 2, 3, 3a, 4–9, 11, 14–20, 22, 23, 30, and 36.

guments. First, defendant contends that—notwithstanding the government's admission that the timber sold pursuant to the Leek and Barney contracts will never be released to Wetsel—the Leek and Barney contracts permit delay and, therefore, the government suspension of those contracts does not constitute a breach. Second, the government argues that, in the absence of appropriate funding to compensate Wetsel, the contracting officer had no authority to modify the contracts and pay Wetsel for the timber that would thereby be deleted. According to defendant, because the contracting officer lacked authority to act—due to lack of funding—there was no breach of contract. The Court finds that both of defendant's arguments lack merit. Additionally, because the Court finds that defendant is liable to plaintiff for timber deleted from the Leek and Barney sales, the Court holds for plaintiff on the issue of liability.

### I. Suspensions and Contract Term Adjustments

■ Defendant first contends that the government did not breach the Leek and Barney contracts because those contracts contain Standard Provision B8.21 which permits the Forest Service to extend, delay, or interrupt contract operations. Because the Court finds, and the government admits, that timber sold pursuant to the Leek and Barney contracts will never be released to Wetsel, the Court finds B8.21 inapplicable to this action.

Standard Provision B8.21, "Contract Term Adjustment," provides, in relevant part, for extension of a contract in the event of purchaser delay due to "acts of Government." As such, the presence of Standard Provision B8.21 in the Leek and Barney contracts demonstrates that the parties to those contracts specifically contemplated suspension of the Leek and Barney contracts due to "acts of Government," and allocated that risk by providing for a specific result—the extension of the contract termination date.

In the instant case, the government admits that "the timber that remains under suspension will never be released to Wetsel–Oviatt." Def. Resp. at 6–7. Even without such a candid admission, however, the Court would conclude that the Forest Service does not intend to release the timber Supervisor Phipps recommended be deleted in Phipps' Decision Notices and Environmental Assessments. Indeed, the Appeal Deciding Officer's decisions in August 1995 were final administrative decisions in this regard. Further, the sole justification articulated by the Contracting Officer for denying Wetsel's claims for compensation for deleted timber was the Contracting Officer's belief that he was constrained by the Antideficiency Act. Refusal to ever release timber for which Wetsel contracted to harvest is equivalent to government cancellation of those parts of the contracts for which timber will never be released.

To find merit in the government's contention that Standard Provision B8.21 governs situations where the government refuses to ever release timber sold under the contracts would require the Court to find that the parties to the Leek and Barney contracts chose to allocate the risk of government modification, or partial cancellation, of the contracts in the same manner as the parties allocated the risk of suspension. The Court declines to so find.

A suspension is a temporary event, while a cancellation or modification effects permanent alteration. Indeed, the contractor's remedy under Standard Provision B8.21—extension of the contract termination date—would provide little comfort to a contractor faced with a decision by the government never to release timber sold under the contract. As such Standard Provision B8.21 does not govern situations where—as here—the government has modified or partially terminated parts of a contract.

Further, as permitted by 36 C.F.R. §§ 223.112, 223.113, and 223.116, the Leek and Barney contracts do, independently, contemplate modification or termination of the contracts in certain circumstances. Clause C8.2 of the Leek contract provides:

This contract may be terminated by the Chief, Forest Service, upon determination that Purchaser's Operations would cause serious environmental damage or serious damage to cultural resources, or would be

significantly inconsistent with land management plans adopted or revised in accordance with section 6 of the Forest and Rangeland Renewable Resources Planning Act of 1974, as amended.

Similarly, Clause C8.2 of the Barney contract provides in pertinent part:

> The Chief, Forest Service, by written notice, may terminate this contract, in whole or in part, (1) to comply with a court order ... or (2) upon a determination that the continuation of all or part of this contract would:
>
> (a) cause serious environmental degradation or damage;
>
> .   .   .   .   .
>
> (d) jeopardize the continued existence of Federally listed threatened and endangered species or, cause unacceptable adverse impacts on sensitive species, identified by the appropriate Regional Forester.
>
> Compensation for termination under this provision shall be calculated pursuant to C(T)9.5, except; ... compensation for termination under (2)(d) shall be calculated pursuant to C(T)9.52 when included in this contract.

Moreover, Clause C9.5 of the Leek contract, and clauses C9.5 and C9.52 of the Barney contract, provide for Wetsel's remedy—and limit the government's liability—in the event of a contract termination pursuant to clause C8.2. Thus, clause C8.2 provides the Forest Service with the authority to terminate the contract where the Purchaser's Operations would do serious environmental damage, while clause C9.5—and where applicable C9.52—provide the purchaser's remedy and limit the government's liability in the event of termination pursuant to clause C8.2.

Confronted by similar facts and government argument in *Davidson Industries, Inc.,* AGBCA No. 95–166–1, 96–2 B.C.A. ¶ 28,299, a Board of Contract Appeals recently reached a similar conclusion. *Id.* at 141,304. In *Davidson,* the government suspended Davidson Industries' timber sale contract with the United States citing environmental reasons concerning the northern spotted owl

and marbled murrelet. *Id.* at 141,301. The Davidson Industries contract contained three clauses contemplating modification and/or termination of the contract for environmental reasons. *Id.* at 141,302–03. Two of these clauses were C8.2 and C9.5.[6] *Id.*

After a series of administrative battles with the government, including the filing of claim with the Contracting Officer, Davidson was permitted to harvest portions of the timber referenced in the contract. *Id.* at 141,302. Upon harvest of all timber released, the contracting officer thereafter closed the contract. *Id.* Not satisfied with partial execution of its contract, Davidson sought further remedy, including appeal to the Board of Contract Appeals. *Id.*

As in the instant case, Davidson claimed the right to compensation for timber deleted by the government, but for which no compensation had been provided. *Id.* at 141,303. Defendant argued that clause C9.5 of the Davidson contract did not apply because the Chief of the Forest Service did not terminate the contract under clause C8.2 and the Contracting Officer had no authority to terminate under clause C8.2. Rejecting this government argument, the Board stated,

> [t]he government cannot escape its responsibility by failing to exercise contract rights. Here the Forest Service had the right to cancel or modify the contract[ ]. It chose not to exercise those rights. The Forest Service chose instead to close the disputed portion of the contract without adjustment [ ]. We find no merit to the Government's arguments that having modified a portion of the contract it could close the remainder without compensating [Davidson] for timber deleted without substitutions.

*Id.* at 141,303–04. Although not binding, the Court finds *Davidson*'s reasoning persuasive. In *Davidson,* the government attempted to escape compensating a contractor for timber the government deleted from a timber sale contract by taking refuge behind procedures required for modification and termination of the contract, even though the

---

6.  Clause C8.2 of the *Davidson* contract is identical to clause C8.2 of the Leek contract. *David-*son clause C9.5 is identical to that present in both the Leek and Barney contracts.

government had, in substance, already canceled portions of the contract. So too in the instant case.

Casting its decision to delete timber from the Leek and Barney sales as a suspension, the government argues that it should escape liability for modification and partial cancellation of the contracts, even though the contracts explicitly contemplate and limit the government's liability in the event of modification or cancellation. As the Court has indicated, and the defendant has admitted, the government will never release certain timber from the Leek and Barney sales to Wetsel.[7] The Court finds that the government's admission that it will never release the timber is not a suspension, but is equivalent to a modification or partial cancellation of the Leek and Barney contracts. Defendant's reliance on Standard Provision B8.21 is, therefore, misplaced. Accordingly, the Court holds that the defendant is liable to the plaintiff for timber that will never be released for harvest pursuant to the Leek and Barney contracts. The scope of liability and quantum of damages is limited by clauses C8.2, C9.5, and C9.52, as those clauses are applicable to the Leek and Barney contracts.

## II. Unavailability of Appropriations

■ Defendant next claims that appropriations are unavailable to pay Wetsel for timber that will never be released to Wetsel in conformity with the Leek and Barney contracts. Defendant further argues that if appropriations are unavailable to pay Wetsel, there can be no breach of contract. Thus, reasons defendant, even if the government's refusal to ever release timber to Wetsel under the terms of the contracts would otherwise constitute a breach, the government could not have breached Wetsel's contracts because appropriations are unavailable to pay Wetsel for breach of the Leek and Barney contracts.

### A. Appropriations Clause and the Anti-Deficiency Act

The Appropriations Clause of the United States Constitution provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. In conformity with this constitutional mandate, Congress enacted the Anti-deficiency Act, which provides in pertinent part that "[a]n officer or employee of the United States Government ... may not ... make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation ..." 31 U.S.C. § 1341(a)(1)(A).[8]

■ Despite defendant's protestations otherwise, neither the Appropriations Clause of the Constitution, nor the Anti-deficiency Act, shield the government from liability where the government has lawfully entered into a contract with another party. *See e.g. New York Airways v. United States,* 177 Ct.Cl. 800, 810, 369 F.2d 743 (1966) ("It has long been established that the mere failure of Congress to appropriate funds, without further words modifying of repealing, expressly or by clear implication, the substantive law, does not in and of itself defeat a government obligation created by statute"); *Ferris v. United States,* 27 Ct.Cl. 542, 546, 1800 WL 2022 (1892) (exhaustion of appropriation justifies stopping a contractor's work, but does not constitute a defense to a breach of contract claim); *Parsons v. United States,* 15 Ct.Cl. 246, 247, 1800 WL 1067 (1879) (absence of appropriation is no bar to the recovery of a judgment where the government's liability is established).

Initially, of course, government funding of the Leek and Barney contracts would not have been of concern because Wetsel was *paying* the United States for the right to cut

---

**7.** As *Davidson* correctly reasoned, although clause C8.2 vests the Chief of the Forest Service with authority to terminate, the Forest Service cannot seek to avoid determination that a termination has effectively taken place—particularly where the government has conceded that a termination has taken place—because documentation does not indicate the Chief of the Forest

Service's formal approval. *See Davidson Indus. Inc.,* 96 –2 B.C.A. ¶ 28,299 at 141,303–04.

**8.** Additionally, 41 U.S.C. § 11 provides, in relevant part, that "[n]o contract or purchase on behalf of the United States shall be made, unless the same is authorized by law or is under an appropriation adequate to its fulfillment."

and remove timber pursuant to the contracts. However, the parties did contemplate at least one situation that would require monetary compensation be provided to Wetsel. In this regard, the Leek and Barney contracts contained clauses C8.2 and C9.5, and the Barney contract contained additional clause C9.52. As the Court has noted, these contracts allocated the risk of modification and/or termination of the contracts. Further, the clauses specified and limited the government's monetary liability in the event of government modification or termination. Because the parties to the Leek and Barney contracts contemplated payment to Wetsel in the event of a government modification or termination, the Forest Service cannot now claim no money is owed Wetsel because the Forest Service does not have the funds to pay Wetsel. Insufficient appropriations at the agency level "merely impose[ ] limitations upon the Government's own agents; it is a definite amount of money intrusted to them for distribution; but its insufficiency does not pay the Government's debts, nor cancel its obligations, nor defeat the rights of other parties." *Ferris,* 27 Ct.Cl. at 546; *see also New York Airways, Inc.,* 177 Ct.Cl. at 811, 369 F.2d 743 ("The failure to appropriate funds to meet statutory obligations prevents the accounting officers of the Government from making disbursements, but such rights are enforceable in the Court of Claims."); *Dougherty,* 18 Ct.Cl. at 503 ("The statutory [appropriations] restraints ... apply to the [agency] official, but they do not affect the rights in this court of the citizen honestly contracting with the Government.").

### B. Permanent Indefinite Judgment Fund

■ Nevertheless, assuming the Forest Service does not have appropriations from which to compensate Wetsel, there exists a statutory appropriation from which the government is permitted to pay Wetsel. Pursuant to 41 U.S.C. § 612(a), "[a]ny judgment against the United States on a claim under ... [the Contract Disputes Act] shall be paid promptly in accordance with the procedures provided by section 1304 of Title 31." Wetsel's claims for compensation under the Leek and Barney contracts are before the Court pursuant to 41 U.S.C. § 609(a)(1) and the Contract Disputes Act. Section 612(a) of Title 41 of the United States Code, therefore, governs judgments against the United States by the Court of Federal Claims.

■ Title 31 U.S.C. § 1304(a) provides, in pertinent part, that "[n]ecessary amounts are appropriated to pay final judgments, awards, compromise settlements, and interest and costs specified in the judgments or otherwise authorized by law when ... (1) payment is not otherwise provided for ..." Thus, if the Forest Service has no funds from which to pay Wetsel, this Court may enter judgment for plaintiff and require payment to Wetsel.[9] *See Bath Iron Works Corp. v. United States,* 20 F.3d 1567, 1583 (Fed.Cir.1994) ("[Title 31, section 1304] was intended to establish a central, government-wide judgment fund from which judicial tribunals administering or ordering judgments, awards, or settlements may order payments without being constrained by concerns of whether adequate funds existed at the agency level to satisfy judgment."); *Lopez v. A.C. & S., Inc.,* 858 F.2d 712, 716 (Fed.Cir.1988) ("There is a standing appropriation to pay court judgments and appeal board awards, 31 U.S.C. § 1304, so courts and boards, in rendering judgment, are not required to investigate whether program funds are available.").

---

**9.** Additionally, even where the Appropriations Clause and the Anti-deficiency Act prohibit payment from the United States Treasury, and in the absence of a "funds available" type clause limiting the government's liability, there is no bar to a Court's otherwise valid declaration of parties' rights in a contractual claim against the government. Title 28 U.S.C. § 1491(a)(2) provides, in part relevant, that "[t]he Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 10(a)(1) of the Contract Disputes Act of 1978 ["CDA"], including a dispute concerning termination of a contract ... and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act." Plaintiff's claim in this case is one by a contractor concerning the termination of contracts with the government under the CDA where a final decision of the contracting officer has been rendered on plaintiff's claims. Thus, even if prohibited from ordering money to be paid from the Treasury, this Court would have jurisdiction to issue a declaration of liability on defendant's breach of contract claims.

  In sum, notwithstanding the Appropriations Clause and the Anti-deficiency Act, the Court finds that, where the government lawfully contracts with another, the government cannot avoid liability—and must compensate the party with whom the government lawfully contracts—if there is found to be a government breach of contract. Further, in this case, there exists a statutory source of appropriations to pay final judgments against—and compromise settlements with—the United States, for which payment is not otherwise provided.

### III. Summary Judgment Standard

Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(c). The moving party bears the burden of demonstrating the absence of genuine issues of material fact and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Jay v. Secretary of DHHS*, 998 F.2d 979, 982 (Fed.Cir. 1993). Inferences drawn from the evidence produced must be viewed in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986).

Although defendant has opposed plaintiff's motion for summary judgment, the parties' briefs and oral arguments make clear that no material facts are in dispute. Because the Court rejects the defendant's contentions that the government did not breach its obligation to compensate the plaintiff's in accordance with clause C8.2 and C9.5 of the Leek and Barney contracts, and C9.52 of the Barney contract, the Court holds for the plaintiff on the issue of liability. Further, because it is undisputed that Wetsel lawfully contracted with the government for the Leek and Barney sales, the Appropriations Clause and the Anti–Deficiency Act do not shield the government from paying funds for which it is liable. Accordingly, plaintiff has met its burden of demonstrating that no material facts are in dispute and that plaintiff is entitled to judgment as a matter of law.

## CONCLUSION

For the reasons stated, plaintiff's motion for summary judgment on the issue of liability is granted. A further hearing on the quantum of damages shall be scheduled.