Donna L. WILLIAMS, Appellant,

v.

**DISTRICT OF COLUMBIA,**
et al., Appellees.

No. 03–CV–1271.

District of Columbia Court of Appeals.

Argued Dec. 7, 2005.
Decided June 22, 2006.

Donna M. Doblick, Pittsburgh, PA, with whom Edward J. McAndrew, Washington, DC, was on the brief, for appellant.

James C. McKay, Jr., Senior Assistant Attorney General, with whom Robert J. Spagnoletti, Attorney General for the District of Columbia, and Edward E. Schwab, Deputy Attorney General, were on the brief, for appellees.

Before SCHWELB and FARRELL, Associate Judges, and NEBEKER, Senior Judge.

NEBEKER, Senior Judge:

## I.

The Consumers United Insurance Company ("CUIC") appeals the Superior Court's decision to grant appellee District of Columbia's motion for summary judgment. CUIC argues that the District of Columbia defrauded CUIC when the parties entered into an agreement in which the District's agents lacked the authority to bind the District. We detect no error, and therefore, affirm.

## II.

In 1985, CUIC entered into a "Tri–Party Agreement" ("the Agreement") with the District of Columbia's Department of Housing and Community Development ("DHCD") and the Trust for Public Land ("TPL") in order to carry out what the parties called the Parkside Project. The Agreement provided that TPL would purchase a parcel of land in Northeast Washington to prepare for sale to a developer. CUIC would loan TPL the funds to buy the property. Paragraph 3(e) of the Agreement contained a provision whereby, upon CUIC's demand, but no sooner than 18 months after the Agreement was signed, the District was required to purchase the CUIC Note and the CUIC Deed of Trust ("the Note and Deed"), and retake title to the property.[1] To this end,

---

1. Paragraph 3(e) provided the following: Notwithstanding any other provision of this Paragraph 3, CUIC may (i) upon the expiration of eighteen (18) months from the effective date of this Agreement (and regardless of whether or not a final development plan has been approved as provided in subparagraph 2(e) of this Agreement) and (ii) at any time mutually agreed by CUIC and DHCD, require the purchase by DHCD of the CUIC Note and the CUIC Deed of Trust for an amount equal to the total amount then secured by the CUIC Deed of Trust less any amount advanced by CUIC pursuant to subparagraph 2(d) of this Agreement (for development planning purposes). DHCD agrees that it will purchase such CUIC Note and CUIC Deed of Trust for such amount within

¶ 5(c) of the Agreement ("the express warranty") explicitly provided that DHCD had set aside funds for the project, that it had the authority to enter such an agreement, and that performance of the Agreement would not violate any laws.[2] DHCD also represented to CUIC separately that it had the authority to enter into the Agreement, that the Agreement was legal and enforceable, and that its performance would not violate any law. Madeleine Petty, who at the time was director of DHCD, made specific, written representations to CUIC that the District had committed sufficient funds to perform its obligations under the Agreement. In 1989, David Dennison (who had by then assumed directorship of DHCD) executed an addendum to the Agreement, ratifying the Agreement's original provisions.

In July 1996, CUIC expressed its desire to invoke ¶ 3(e). Only then did DHCD convey its belief that ¶ 3(e) was unenforceable, and that the funds had never, in fact,

been set aside in the DHCD annual appropriations in 1985 or ensuing annual appropriations to purchase the Note and Deed.[3] However, CUIC did not attempt to formally exercise its rights under ¶ 3(e) until February 1999, at which time DHCD refused, claiming that the Agreement was unenforceable.

In July 1999, Donna Williams, as receiver for CUIC, filed a complaint in Superior Court against the District. The complaint contained fourteen counts, including fraud. The District moved to dismiss, on the grounds that CUIC did not comply with the provisions of D.C.Code § 12–309, requiring that tort claimants wishing to sue the District send a letter to the Mayor within six months of the injury, setting forth certain information. The trial court denied the motion.

Both parties then made motions for summary judgment. The trial court found that the provisions in question violated 31 U.S.C. § 1341 (2003) (often referred to as

---

thirty (30) days of its receipt of written notice from CUIC that CUIC is requiring such purchase. Immediately upon DHCD's purchase of the CUIC Note and CUIC Deed of Trust as provided in this subsection 3(e), TPL shall transfer and convey the Property (or so much thereof as has not been previously conveyed) to DHCD in exchange for the release of the CUIC Note, the CUIC Deed of Trust, the DHCD Note, and the DHCD Deed of Trust.

2. Paragraph 5(c) provided the following:

(1) This Agreement and the DHCD Deed of Trust have been duly authorized and constitute valid and legally binding obligations enforceable against it in accordance with their terms, except as limited by bankruptcy or other similar laws relating to or affecting the enforcement of creditors' rights;
(2) There is no action or proceeding pending or threatened, known to it, which questions the validity or the prospective validity of this Agreement or the DHCD Deed of Trust insofar as such validity relates to its authority, or any essential element upon

which this Agreement depends, or any action to be taken by it pursuant to this Agreement or in connection with the present transactions; and
(3) Insofar as its capacity to carry out any obligation under this Agreement or the DHCD Deed of Trust is concerned, its execution of, and performance pursuant to, the provisions of such documents and instruments will not result in the breach or violation of any provision of any statute, regulation, agreement, judgment, or decree to which it is subject; and
(4) Insofar as legally required, it has committed sufficient funds to satisfy its obligations under this Agreement and will insure that such funds remain available for such purpose until required to be expended in accordance with the provisions hereof or until such obligations are otherwise satisfied or discharged.

3. During discovery, both Petty and Dennison admitted that they never had any inkling as to whether the District had allocated funds to purchase the Note and Deed, if CUIC had so demanded.

the Anti–Deficiency Act), and were therefore void ab initio. The court further rejected CUIC's claim of fraud, concluding in light of settled law that, under the circumstances, CUIC could not reasonably rely on promises by District officials. "Nothing," the court added, "prevented CUIC from demanding evidence of an appropriation covering the [District's contractual commitment] before entering into the transaction." The court, therefore, held in favor of the District. CUIC appealed, but only as to the fraud claim.

### III.

■■■■ We review orders granting summary judgment *de novo*. *Tobin v. John Grotta Co.*, 886 A.2d 87, 89 (D.C.2005). The standard on appeal is identical to that used by the trial court: a motion for summary judgment should be granted where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Id.*

■■■■ In cases involving commercial contracts negotiated at arm's length, a plaintiff claiming fraud must establish by clear and convincing evidence that, *inter alia*, "the defrauded party's reliance [was]

*reasonable.*" [4] *Hercules & Co. v. Shama Rest. Corp.*, 613 A.2d 916, 923 (D.C.1992) (emphasis in original). Because we hold that under these facts, CUIC failed to show that its reliance was reasonable, we affirm the trial court's grant of summary judgment.[5]

In light of the principles now codified at 31 U.S.C. § 1341,[6] the Supreme Court of the United States and other federal courts have explicitly and repeatedly held that all contracts for future payments of money, in advance of or in excess of existing appropriations, are void ab initio. *Hercules Inc. v. United States*, 516 U.S. 417, 427, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996); *Goodyear Tire & Rubber Co. v. United States*, 276 U.S. 287, 66 Ct.Cl. 764, 48 S.Ct. 306, 72 L.Ed. 575 (1928); *Leiter v. United States*, 271 U.S. 204, 46 S.Ct. 477, 70 L.Ed. 906 (1926); *see, e.g.*, *E.I. du Pont de Nemours & Co. v. United States*, 365 F.3d 1367, 1374 (Fed.Cir.2004); *RCS Enters. v. United States*, 57 Fed.Cl. 590, 594 (2003).

■■■■ CUIC claims that the Act is inapplicable here because ample HUD "block grant" funds were available to DHCD in 1999, when CUIC attempted to

---

**4.** The remaining elements are a false representation, in reference to material fact, with knowledge of its falsity, and an intent to deceive. *Atraqchi v. GUMC Unified Billing Servs.*, 788 A.2d 559, 563 (D.C.2002).

**5.** The District also claims that DHCD never intended to deceive CUIC. Because, as we explain below, CUIC's reliance could not have been reasonable, we need not address the "intent" element of the fraud claim.

**6.** The Act provides that "[a]n officer or employee of the United States Government or of the District of Columbia government may not make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation," 31 U.S.C. § 1341(A), or "involve either government in a contract or obligation for the payment of money before an appropri-

ation is made unless authorized by law." 31 U.S.C. § 1341(B). *See also* D.C.Code § 1–204.46 ("no amount may be obligated or expended by any officer or employee of the District of Columbia government unless such amount has been approved by Act of Congress, and then only according to such Act"); D.C.Code § 47–355.02. Notwithstanding passing references to 31 U.S.C. § 1341 in *Sullivan v. District of Columbia*, 829 A.2d 221 (D.C.2003), *Atchison v. District of Columbia*, 585 A.2d 150 (D.C.1991), *Barry v. Bush*, 581 A.2d 308 (D.C.1990), and *Convention Ctr. Referendum Comm.v. District of Columbia Bd. of Elections & Ethics*, 441 A.2d 889 (D.C.1981), this is the first case in which we have had occasion to apply the statute in depth and on the merits.

exercise the ¶ 3(e) provisions.[7] Therefore, urges CUIC, appropriations were unnecessary; the District merely had to distribute some of the HUD entitlement monies to DHCD so that the agency could purchase the Note and Deed. However, this line of reasoning evinces a fundamental misunderstanding of 31 U.S.C. § 1341. Paragraph 3(e) promised a payment whose amount would be determined solely by CUIC at some future, unspecified date (if ever), but no sooner than 18 months after the signing of the Agreement. Because the ¶ 3(e) option could not be exercised within the current fiscal year in which the Agreement was signed, it was voided by the 31 U.S.C. § 1341(a)(1)(B) prohibition on any "payment of money before an appropriation is made." With certain exceptions not relevant here, the government must affirmatively reauthorize its multiyear contracts on an annual basis. *Goodyear Tire & Rubber Co., supra,* 276 U.S. at 291–92, 48 S.Ct. 306; *Leiter, supra,* 271 U.S. at 207, 46 S.Ct. 477; *see also Lee by Lee v. United States,* 124 F.3d 1291, 1295 (Fed.Cir.1997) (under 31 U.S.C. § 1502, "funds appropriated for one year may not be used for needs of another subsequent year"); *Solar Turbines Int'l v. United States,* 3 Cl.Ct. 489, 495 (1983) ("Congress appropriates funds for only a single year's obligations, and the Anti–Deficiency Act prohibits anyone from obligating the government in excess of the dollars appropriated by Congress" (footnote omitted)). Here, the record reveals that funds were never appropriated to comply with the Agreement in 1985, and it is undisputed that no such appropriation was made against available funds in 1999.

■ Moreover, because ¶ 3(e) was never valid in the first place, the existence *vel non* of any subsequent HUD funds is irrelevant.[8] A contract will only bind the government in subsequent years if appropriations are made in those "out years," and if the government affirmatively renews the contract. *Goodyear Tire & Rubber Co., supra,* 276 U.S. at 291–92, 48 S.Ct. 306; *Leiter, supra,* 271 U.S. at 207, 46 S.Ct. 477; *see also Union Pac. R.R. Corp. v. United States,* 52 Fed.Cl. 730, 734–35 (2002). Here, neither condition was present, and ¶ 3(e) is, therefore, void ab initio.[9]

---

7. Under the United States Department of Housing and Urban Development's Housing and Community Development Act of 1974, 42 U.S.C. §§ 5301–5321, the District is statutorily entitled to multi-million dollar, blanket appropriations from Congress. *Id.* at § 5306(a)(3). The District then spends these HUD "block grants" as it sees fit, subject only to broad federal requirements. *See id.* at § 5301.

8. CUIC's related argument—that 31 U.S.C. § 1341 is inapplicable to this case because the parties had anticipated that the funding would come from HUD block grants, as opposed to directly from Congress—also fails. See note 7, *supra.* Tracing the block grant funding one step further back reveals that, though Congress may use HUD as a conduit to allocate funds to the District's housing needs, all of the funds originally derive from the legislature's purse. 42 U.S.C. § 5306(a)(3). Hence, the rationale for enforcing 31 U.S.C. § 1341 applies with equal force to the case at bar. *See Cessna Aircraft Co. v. Dalton,* 126 F.3d 1442, 1448–49 (Fed.Cir. 1997).

9. In this respect, the cases on which CUIC relies are inapplicable, as they involved contracts which were initially valid. *Cherokee Nation v. Leavitt,* 543 U.S. 631, 634, 125 S.Ct. 1172, 161 L.Ed.2d 66 (2005); *Massachusetts Bay Transp. Auth. v. United States,* 129 F.3d 1226, 1231 (Fed.Cir.1997); *Wetsel–Oviatt Lumber Co. v. United States,* 38 Fed.Cl. 563, 570 (1997); *In re All Asbestos Cases,* 603 F.Supp. 599, 612 n. 6 (D.Haw.1984); *Ferris v. United States,* 27 Ct.Cl. 542, 546 (1892); *Dougherty v. United States,* 18 Ct.Cl. 496, 503 (1883). Also distinguishable is *New York Airways, Inc. v. United States,* because it addressed "a Government obligation created by statute" and the "unless authorized by law"

■ CUIC's reliance on the express warranty at ¶ 5(c) is also unavailing. In accordance with Supreme Court case law, this court has repeatedly held that one who contracts with a government agent is constructively notified of the limits of that agent's authority, and any reliance on contrary representations cannot be reasonable. *Leonard v. District of Columbia*, 801 A.2d 82, 86 (D.C.2002); *District of Columbia v. Greene*, 806 A.2d 216, 222 n. 7 (D.C.2002) ("persons dealing with a municipal corporation through its agent are bound to know the nature and extent of the agent's authority") (quoting *Coffin v. District of Columbia*, 320 A.2d 301, 303 (D.C.1974)); *Chamberlain v. Barry*, 606 A.2d 156, 159 (D.C.1992); *Strong v. District of Columbia*, 1 Mackey 265 (D.C.Sup. 1881). *See also Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947).[10]

■ A government agent cannot validate a contract merely by averring that she is authorized to enter it, if no such authority exists; the rule applies with equal force even if "the agent himself may have been unaware of the limitations upon his authority." *Merrill, supra*, 332 U.S. at 384, 68 S.Ct. 1. To permit otherwise would eviscerate the very purpose of the Act. *Cessna Aircraft Co. v. Dalton*, 126 F.3d 1442, 1448–49 (Fed.Cir.1997) (Anti-Deficiency Act intended to halt practice by which "[government] officials were obligating funds before they were appropriated by Congress, and then making deficiency requests for appropriations that Congress had little choice in deciding because government agencies had basically committed the United States to make good on its promises"); *Lopez v. Johns Manville*, 649 F.Supp. 149, 158 (D.Wash.1986), *aff'd by Lopez v. A.C. & S., Inc.*, 858 F.2d 712 (Fed.Cir.1988) ("purpose of the statute is to prohibit anyone from obligating the Government in excess of the dollars appropriated by Congress"). Therefore, as a matter of law, it was not possible for CUIC to prove the reasonable reliance necessary to prevail on a claim of fraud. *Shama Rest. Corp., supra*, 613 A.2d at 923.[11]

### IV.

Because the Agreement was void ab initio, and because CUIC was constructively notified that the DHCD officials were never authorized to bind the District to the Agreement, the trial court's grant of summary judgment to the District is

*Affirmed.*

---

exception to the Act, at 31 U.S.C. § 1341(B). 177 Ct.Cl. 800, 369 F.2d 743, 748 (1966). Here, CUIC contends neither that the District is statutorily obliged to honor the Agreement, nor that the § 1341(B) exception applies.

**10.** Hence, CUIC's citations to *Cassidy v. Owen*, 533 A.2d 253 (D.C.1987), and *Mills v. Cosmopolitan Ins. Agency, Inc.*, 424 A.2d 43 (D.C.1980), are inapposite. Whether an agent had the apparent authority to bind a principal is generally a question of fact. *Makins v. District of Columbia*, 861 A.2d 590, 594 (D.C. 2004) (apparent authority may arise when third person reasonably believes that the principal had consented to agent's exercise of authority). However, a private party's transactions with the government present an exception to this rule, insofar as the issue of whether a contractor's reliance on a *government* agent's professed authority was reasonable becomes a question of *law*. *See Greene*, 806 A.2d at 222; *Merrill*, 332 U.S. at 384, 68 S.Ct. 1; *Pia v. United States*, 7 Cl.Ct. 208 (1985), *aff'd*, 818 F.2d 876 (Fed.Cir.1987) ("The doctrine found in agency law of apparent authority does not apply to the government").

**11.** Because we affirm on the same bases as did the Superior Court, we need not address the District's alternative argument that D.C.Code § 12–309 precluded CUIC's fraud claim.

SCHWELB, Associate Judge, concurring:

To the limited extent that a lawsuit can be deemed a morality play, this one does not come out right. Because I believe that I am required to do so by statute and precedent—and only for that reason—I concur in the judgment of the court, and I join the court's opinion as far as it goes. I agree that summary judgment in favor of the District must be affirmed, for two of the District's ranking officials lacked the authority to bind the District when they deliberately or recklessly made significant misrepresentations of fact and law to the plaintiff. This is so even though these officials almost certainly knew, and indisputably should have known, that their assurances were false.

Nevertheless, the blithe and unapologetic tone in which the District now defends its reneging on the promises on which the plaintiff relied to its[1] very substantial detriment strikes me as an embarrassment to the District and its citizens. Invoking the Anti–Deficiency Act to avoid paying money under a contract "proves to U.S. industry that the Government is an unreliable contracting partner that will make promises and then do everything in its power not to honor them." *The Anti–Deficiency Act: A "Normal" Government Defense?*, 17 No. 12 Nash & Cibinic Rep. 63 (Dec. 2003). After *Williams v. District of Columbia*, a contractor can hardly be faulted if he or she is a trifle cautious about accepting assurances from officials of the District of Columbia government.[2]

---

**1.** I refer to the plaintiff as neuter because the underlying dispute is between the contractor and the District of Columbia.

**2.** The false or reckless promises which formed the basis for this suit were made several administrations ago, but as recently as

The 1985 Tri–Party Agreement on which the plaintiff's case is founded included the following representation of historical fact:

> Insofar as legally required, [*the District*] *has committed sufficient funds to satisfy its obligations under the Agreement* and will insure that such funds remain available for such purpose until required to be expended in accordance with the provisions hereof or until such obligations are otherwise satisfied or discharged.

(Emphasis added.) The officials of the District who made this representation included a Deputy Corporation Counsel, who was the chief negotiator for the District, and the Director of the District's Department of Housing and Community Development (DCHD), who signed the agreement on behalf of the District. In fact, the District had *not* committed sufficient funds for this project; indeed, this was a multi-year contract and the funds could not have been appropriated for it in advance. Nevertheless, a high-ranking legal official in the District government and the head of DCHD assured the plaintiff that the District's obligations had been fully funded, when they had not.

In the Tri–Party Agreement, the District also represented the following:

(2) "[i]nsofar as legally required," the District "will insure that such funds remain available for such purpose until required to be expended in accordance with the provisions hereof or until such obligations are otherwise satisfied or discharged" . . .;

(3) the Tri–Party Agreement has been "duly authorized" . . .;

---

2005, counsel for the District asserted in its brief and in oral argument, without the slightest indication of embarrassment, that the plaintiff is out of luck because it believed the District's officials' solemn representations.

(4) the Tri–Party Agreement "constitute[s a] valid and legally binding obligation enforceable against [the District] in accordance with [its] terms" . . .; and

(5) DCHD's "execution of," "performance pursuant to," and "provisions of" the Tri–Party Agreement "will not result in the breach or violation of any provision of any statute . . . to which [the DCHD] is subject". . . .

(Citations to appendix omitted.) But all of these representations, the District now says, were unauthorized, and, according to the District, the plaintiff had no right to rely upon them and acted unreasonably in doing so. Another way of putting the proposition now advanced by the District is that any reasonable person or business entity in the plaintiff's position should have assumed that a Deputy Corporation Counsel and the head of DCHD were either lying or did not know what they were talking about, or perhaps both.

As the plaintiff points out in its brief, the District does not dispute—indeed, its litigation strategy has been to herald the fact—that the above-described representations were categorically false at the time its high-ranking officials made them. The District had not only failed to commit "sufficient funds" to satisfy its obligations under the Tri–Party Agreement, but it had not committed *any* funds to the project. Years after solemnly assuring the plaintiff that the contrary was the case, the District now asserts that the agreement had *not* been duly authorized, and that it was not then, and is not now, a valid and binding obligation. Although the District represented in this agreement that performance of its obligations thereunder "will not result in the breach or violation of any statute" to which DCHD was subject, the District now asserts, in stark contrast to the foregoing assurance, that if it were to carry out the promises it made to the plaintiff, this would run afoul of the Anti–Deficiency Act and comparable provisions of District of Columbia law.

The plaintiff claims that, as a result of the District's breach, it has received three payments totaling only $2.1 million of approximately $14 million repayable under its loans. It is out-of-pocket to the tune of millions of dollars because it trusted the word of District officials when the District now says, correctly as a matter of law, that these officials' solemnly given word was not to be trusted. As the court points out, one who contracts with a government agent is constructively notified of the limits of that agent's authority, and cannot reasonably rely on representations to the contrary. Maj. op., *ante*, at p. 96. "Congress appropriates funds for only a single year's obligations, and the Anti–Deficiency Act prohibits anyone from obligating the government in excess of the dollars appropriated by Congress." Maj. op., *ante*, at p. 95 (citation omitted). I therefore cannot quarrel with the result that the trial judge and this court have reached.

The assurances in this case were not provided to the plaintiff by a low-ranking contracting agent, but by a Deputy Corporation Counsel and by the head of the relevant Department of the District's government. At the very least, the District's current officials might be expected to express some regret over the false representations made by their predecessors and to apologize to the party that relied on their predecessors' words. They might also be expected to provide credible assurances to the citizens of the District, and to those who do business with the District's government, that the conduct revealed in this record will not be repeated.[3] Surely honor

3. That, in my view, is not the tone reflected in the District's brief in this case.

should play some role in the District's dealings with its contractors.[4]

Sovereign immunity and related doctrines are all descended from the ancient belief in the divine right of kings and from the patent canard, exposed as such over many centuries of history, that the king can do no wrong. In some measure, these doctrines are still needed today to protect the public fisc. In this case, however, it is not much of an exaggeration to say that the liar is faulting the victim for having believed his lies. However diplomatically one might wish to phrase it, this is the underlying truth about the present dispute. Before *Williams v. District of Columbia* becomes history, this truth should be recorded for posterity, even if only in the Atlantic Second Reporter.

NEBEKER, Senior Judge:

As author of the court's opinion, it is my duty to state the law as it is and the result dictated by that law. That said, I am constrained to state that I am in complete agreement with Judge Schwelb that the behavior of the District of Columbia officials in 1985 in the matter was highly unprofessional and disgraceful. Indeed, in my judgment, that conduct was official action "which would adversely affect the confidence of the public in the integrity of the District government." *See* D.C. Personnel Regulations, Chapter 18, Part I, § 1800.1.

---

4. In my opinion, the following commentary fits the situation before us to a "T":

Using a contract clause that leads the contractor to believe that Government is going to indemnify it and then defending against the contractor's claim on the grounds that the clause is illegal is not fair dealing. We know that Government contractors are supposed to know all of the legal rules and protect themselves, but the Government also has an obligation not to play shell games in the contracting process.
*Recovering in the Face of an "Illegal" Indemnification Clause: Ingenious Solutions?* 16 No. 11 Nash & Cibinic Rep. 54 (Nov. 2002).