Newman, Circuit Judge, dissenting.
The United States and members of the health insurance industry, in connection with the program referred to as "Obamacare," agreed to a three-year plan that would mitigate the risk of providing low-cost insurance to previously uninsured and underinsured persons of unknown health risk. This risk-abatement plan is included in the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010) (ACA). As described by the Court of Federal Claims,[1] the "risk corridors" provision accommodates the unpredictable risk of the extended healthcare programs. By this provision, the government will " 'share in profits or losses resulting from inaccurate rate setting from 2014 to 2016.' " Fed. Cl. Op., 130 Fed.Cl. at 444 (quoting HHS Notice of Benefit and Payment Parameters for 2014 , 77 Fed. Reg. 73,118, 73,121 (Dec. 7, 2012) ). The risk corridors program was enacted as Section 1342 of the Affordable Care Act, and is codified in Section 18062 of Title 42. Subsection (a) is as follows:
The Secretary shall establish and administer a program of risk corridors for calendar years 2014, 2015, and 2016 under which a qualified health plan offered in the individual or small group market shall participate in a payment adjustment system based on the ratio of the allowable costs of the plan to the plan's aggregate premiums. Such program shall be based on the program for regional participating provider organizations under part D of [the Medicare Act].
42 U.S.C. § 18062(a). The statute contains a detailed formula for this risk corridors sharing of profits and losses. Healthcare insurers throughout the nation, including Moda Health Plan, accepted and fulfilled the new healthcare procedures, in collaboration with administration of the ACA by the Centers for Medicare and Medicaid Services (CMS) in the Department of Health and Human Services (HHS).
Many health insurers soon experienced losses, attributed at least in part to a governmental action called the "transitional policy." Reassurance was presented, and Moda (and others) continued to perform their obligations. Although the government continued to collect "payments in" from insurers who more accurately predicted risk, the government has declined to pay its required risk corridors amounts, by restricting the funds available for the "payments out."
The Court of Federal Claims held the government to its statutory and contractual obligations to Moda. My colleagues do not. I respectfully dissent.
The Court of Federal Claims interpreted the statute in accordance with its terms
The ACA provides the risk corridors formula, establishing that the insurer will *1332 make "payments in" to the government for the insurer's excess profits as calculated by the formula, and "payments out" from the government for the insurer's excess losses. The formula was enacted into statute:
The Secretary shall provide under the program established under subsection (a) that if-
(A) a participating plan's allowable costs for any plan year are more than 103 percent but not more than 108 percent of the target amount, the Secretary shall pay to the plan an amount equal to 50 percent of the target amount in excess of 103 percent of the target amount; and
(B) a participating plan's allowable costs for any plan year are more than 108 percent of the target amount, the Secretary shall pay to the plan an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target amount.
42 U.S.C. § 18062(b). In March 2012, HHS issued regulations for the risk corridors program, stating that Qualified Health Plans (QHPs) "will receive payment" or "must remit charges" depending on their gains or losses. 45 C.F.R. § 153.510(b), (c). In March 2013, HHS stated:
The risk corridors program is not statutorily required to be budget neutral. Regardless of the balance of payments and receipts, HHS will remit payments as required under section 1342 of the Affordable Care Act.
HHS Notice of Benefit and Payment Parameters for 2014 , 78 Fed. Reg. 15410, 15473 (Mar. 11, 2013) (JA565). Moda cites this reassurance, as Moda continued to offer and implement healthcare policies in accordance with the Affordable Care Act.
The "transitional policy" resulted in a change in the risk profile of participants in the Affordable Care Act. Moda states that "many individuals who had previously passed medical underwriting, and were considerably healthier than the uninsured population, maintained their existing insurance and did not enroll in QHPs," Moda Br. 7-8, thereby reducing the amount of premiums collected from healthier persons. HHS stated, in announcing the transitional policy, that "the risk corridor program should help ameliorate unanticipated changes in premium revenue." Letter from Gary Cohen, Dir., CMS Ctr. for Consumer Info. and Ins. Oversight ("CCIIO"), to State Ins. Comm'rs at 3 (Nov. 14, 2013) (JA431).
The transitional policy was initially announced as applying only until October 1, 2014. Id. at 1 (JA429). However, it was renewed throughout the period here at issue. Memorandum from Kevin Counihan, Dir., CMS CCIIO (Feb. 29, 2016) (JA457).
The risk corridors obligations were not cancelled by the appropriations riders
In April 2014, HHS-CMS issued an "informal bulletin" stating, "We anticipate that risk corridors collections will be sufficient to pay for all risk corridors payments. However, if risk corridors collections are insufficient to make risk corridors payments for a year, all risk corridors payments for that year will be reduced pro rata to the extent of any shortfall." Memorandum from CMS CCIIO, Risk Corridors and Budget Neutrality (Apr. 11, 2014) (JA229). HHS also stated "that the Affordable Care Act requires the Secretary to make full payments to issuers," and that it was "recording those amounts that remain unpaid ... [as an] obligation of the United States Government for which full payment is required." Memorandum from CMS CCIIO, Risk *1333 Corridors Payments for the 2014 Benefit Year (Nov. 19, 2015) (JA245).
The issue on this appeal is focused on the interpretation and application of the "rider" that was attached to the omnibus annual appropriations bills. This rider prohibits HHS from using its funds, including its bulk appropriation, to make risk corridors payments. My colleagues hold that this rider avoided or indefinitely postponed the government's risk corridors obligations. The Court of Federal Claims, receiving this argument from the United States, correctly discarded it.
Meanwhile, the risk corridors statute was not repealed or the payment regulations withdrawn, despite attempts in Congress. Moda continued to perform its obligations in accordance with its agreement with the CMS's administration of the Affordable Care Act.
A statute cannot be repealed or amended by inference
To change a statute, explicit legislative statement and action are required. Nor can governmental obligations be eliminated by simply restricting the funds that might be used to meet the obligation. The appropriation riders that prohibited the use of general HHS funds to pay the government's risk corridors obligations did not erase the obligations. The Court of Federal Claims correctly so held.
The mounting problems with the Affordable Care Act did not go unnoticed. In September 2014, the General Accountability Office (GAO) responded to an inquiry from Senator Jeff Sessions and Representative Fred Upton, and stated that "the CMS PM [Centers for Medicare Services-Program Management] appropriation for FY 2014 would have been available for making the payments pursuant to section 1342(b)(1)." Letter from Susan A. Poling, GAO Gen. Counsel, to Sen. Jeff Sessions and Rep. Fred Upton 4 (Sept. 30, 2014) (JA237) ("Poling Letter"). The GAO also stated that "payments under the risk corridors program are properly characterized as user fees" and could be used to make payments out. Id. at 6 (JA239). This review also cited the available recourse to the general CMS assessment. However, in December 2014, the appropriations bill for that fiscal year contained a rider that prohibited HHS from using various funds, including the CMS PM funds, for risk corridors payments. The rider stated:
None of the funds made available by this Act from the Federal Hospital Insurance Trust Fund or the Federal Supplemental Medical Insurance Trust Fund, or transferred from other accounts funded by this Act to the "Centers for Medicare and Medicaid Services-Program Management" account, may be used for payments under section 1342(b)(1) of [the ACA] (relating to risk corridors).
Pub. L. No. 113-235, § 227, 128 Stat. 2130, 2491 (2014). Similar riders were included in the omnibus appropriations bills for the ensuing years. As the Court of Federal Claims recited, by September 2016, after collecting all payments in for the 2015 year, it was clear that all payments in would be needed to cover 2014 losses, and that no payments out would be made for the 2015 plan year. Moda states: "The Government owed Moda $89,426,430 for 2014 and $133,951,163 for 2015, but only paid $14,254,303 for 2014 and nothing for 2015, leaving a $209,123,290 shortfall." Moda Br. 10.
The panel majority ratifies an "indefinite suspension" of payment, stating that this was properly achieved by cutting off the funds for payment. The majority correctly states that "the government's statutory obligation to pay persisted independent of the appropriation of funds to satisfy that obligation." Maj. Op. at 1321. However, the *1334 majority then subverts its ruling, and holds that the government properly "indefinitely suspended" compliance with the statute.[2]
In United States v. Will , the Court explained that "when Congress desires to suspend or repeal a statute in force, '[t]here can be no doubt that ... it could accomplish its purpose by an amendment to an appropriation bill, or otherwise.' " 449 U.S. 200, 222, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980) (citing United States v. Dickerson , 310 U.S. 554, 555, 60 S.Ct. 1034, 84 L.Ed. 1356 (1940) ). However, this intent to suspend or repeal the statute must be expressed: "The whole question depends on the intention of Congress as expressed in the statutes." United States v. Mitchell , 109 U.S. 146, 150, 3 S.Ct. 151, 27 L.Ed. 887 (1883).
"The cardinal rule is that repeals by implication are not favored." Posadas v. Nat'l City Bank , 296 U.S. 497, 503, 56 S.Ct. 349, 80 L.Ed. 351 (1936). "The doctrine disfavoring repeals by implication 'applies with full vigor when ... the subsequent legislation is an appropriations measure,' " as here. Tenn. Valley Auth. v. Hill , 437 U.S. 153, 190, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) (citing Comm. for Nuclear Responsibility, Inc. v. Seaborg , 463 F.2d 783, 785 (D.C. Cir. 1971) ). As the Court of Federal Claims observed:
Repealing an obligation of the United States is a serious matter, and burying a repeal in a standard appropriations bill would provide clever legislators with an end-run around the substantive debates that a repeal might precipitate.
Fed. Cl. Op., 130 Fed.Cl. at 458.
The classic case of United States v. Langston , 118 U.S. 389, 6 S.Ct. 1185, 30 L.Ed. 164 (1886), speaks clearly, that the intent to repeal or modify legislation must be clearly stated, in "words that expressly or by clear implication modified or repealed the previous law." Id. at 394, 6 S.Ct. 1185. The Court explained that a statute should not be deemed abrogated or suspended unless a subsequent enactment contains words that "expressly, or by clear implication, modified or repealed the previous law." Id.
My colleagues dispose of Langston as an "extreme example," stating that subsequent decisions are more useful since Langston is a "century and a half" old. Maj. Op. at 1323-24. Indeed it is, and has stood the test of a century and a half of logic, citation, and compliance. Nonetheless discarding Langston , the panel majority finds intent to change the government's obligations under the risk corridors statute. The majority concludes that "Congress clearly indicated its intent" to change the government's obligations, reciting two factors:
First, the majority concludes that the appropriations riders were a response to the GAO's guidance that there were two available sources of funding for the risk corridors program, and that Congress intended to remove the GAO-suggested source of funds from the HHS-CMS program management funds. My colleagues find that, by removing access to the HHS-CMS funds, Congress stated its clear intent to amend the statute and abrogate the payment obligation if the payments in were insufficient. See Poling Letter at 4-6 (JA237-39). Maj. Op. at 1324-25. However, they point to no statement in the legislative *1335 history suggesting that the rider was enacted in response to the GAO's report.
Next, my colleagues look to the remarks of Chairman Harold Rogers to discern intent. He stated:
In 2014, HHS issued a regulation stating that the risk corridor program will be budget neutral, meaning that the federal government will never pay out more than it collects from issuers over the three year period risk corridors are in effect. The agreement includes new bill language to prevent CMS Program Management appropriation account from being used to support risk corridors payments.
160 Cong. Rec. H9307, H9838 (daily ed. Dec. 11, 2014) (explanatory statement submitted by Rep. Rogers, Chairman of the House Comm. on Appropriations, regarding the House Amendment to the Senate Amendment on H.R. 83, the Consolidated and Further Continuing Appropriations Act, 2015). Chairman Rogers is referring to the April 2014 "guidance," where HHS stated that they "anticipate that risk corridors collections will be sufficient to pay for all risk corridors payments." Memorandum from CMS CCIIO, Risk Corridors and Budget Neutrality (Apr. 11, 2014) (JA229). In that guidance, HHS was stating its understanding that "risk corridors collections [might be] insufficient to make risk corridors payments for a year." Id.
In 2014, a bill to require budget neutrality in the operation of the risk corridors program was introduced. Obamacare Taxpayer Bailout Protection Act, S. 2214, 113th Cong. (2014). The proposed legislation sought to amend Section 1342(d) of the ACA to ensure budget neutrality of payments in and payments out. The bill stated:
In implementing this section, the Secretary shall ensure that payments out and payments in under paragraphs (1) and (2) of subsection (b) are provided for in amounts that the Secretary determines are necessary to reduce to zero the cost ... to the Federal Government of carrying out the program under this section.
Id. at § 2(d). The proposal, introduced by Senator Marco Rubio on April 7, 2014, was an effort to change the risk corridors program. The change was proposed, but not enacted, providing an indication of legislative intent.[3]
We have been directed to no statement of abrogation or amendment of the statute, no disclaimer by the government of its statutory and contractual commitments. However, the government has not complied with these commitments-leading to this litigation.
The standard is high for intent to cancel or amend a statute. The standard is not met by the words of the riders. "[T]he intention of the legislature to repeal must be clear and manifest." Posadas , 296 U.S. at 503, 56 S.Ct. 349. "In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable." Morton v. Mancari , 417 U.S. 535, 550, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974) (citing *1336 Georgia v. Pennsylvania R.R. Co ., 324 U.S. 439, 456-57, 65 S.Ct. 716, 89 L.Ed. 1051 (1945) ). Here, where there is no irreconcilable statute, repeal by implication is devoid of any support.
The panel majority does not suggest that intent to repeal can be found in the rider itself. Nor can intent be inferred from any evidence in the record. It is clear that Congress knew what intent would have looked like, because members of Congress tried, and failed, to achieve budget neutrality in the risk corridors program.
Instead, my colleagues hold that the statutory obligation was not repealed, but only "temporarily suspended." The unenacted text of the proposed "Bailout Act," reproduced supra , would have accomplished the result of budget neutrality that the majority finds was achieved by the riders. Congress' decision to forego this proposed repeal is highly probative of legislative intent.
Precedent does not deal favorably with repeal by implication-the other ground on which my colleagues rely. The panel majority relies heavily on United States v. Vulte , 233 U.S. 509, 34 S.Ct. 664, 58 L.Ed. 1071 (1914). However, Vulte supports, rather than negates, the holding of the Court of Federal Claims. The facts are relevant: Lt. Vulte's pay as a lieutenant in the Marine Corps for service in Porto Rico was initially based on the Army's pay scale, and in 1902 Congress implemented a ten percent bonus for officers of his pay grade. In the appropriations acts for foreign service, for 1906 and 1907, Congress excluded officers serving in Porto Rico from receiving the bonus. In the act for 1908, the appropriations act continued the 10% bonus but did not mention an exclusion for service in Porto Rico. Lieutenant Vulte sought the bonus for 1908. The government argued that the 1906 and 1907 acts effectively repealed the 1902 bonus. The Court disagreed, and held that although the bonus was restricted for 1906 and 1907, the 1902 act was not repealed, and he was entitled to the 1908 bonus. Id. at 514, 34 S.Ct. 664.
The panel majority concludes that Vulte established a rule of "effective suspensions-by-appropriations." Maj. Op. at 1325. That is not a valid conclusion. The Court held that, by altering the bonus for 1906 and 1907, Congress cannot have intended to effectuate a permanent repeal of the 1902 statute. Vulte , 233 U.S. at 514-15, 34 S.Ct. 664. And Vulte did not retroactively strip the officers of pay for duties they had performed while subject to the higher pay. On the question of whether an annual appropriations rider can permanently abrogate a statute, the Vulte Court stated:
'Nor ought such an intention on the part of the legislature to be presumed, unless it is expressed in the most clear and positive terms, and where the language admits of no other reasonable interpretation.' This follows naturally from the nature of appropriation bills, and the presumption hence arising is fortified by the rules of the Senate and House of Representatives.
Id. at 515, 34 S.Ct. 664 (quoting Minis v. United States , 40 U.S. (15 Pet.) 423, 445, 10 L.Ed. 791 (1841) ). The panel majority's contrary position is not supported.
The panel majority also relies on United States v. Mitchell , 109 U.S. 146, 3 S.Ct. 151, 27 L.Ed. 887 (1883), to support the majority's ruling of "temporary suspension." Again, the case does not support the position taken by my colleagues. In Mitchell an appropriations act initially set the salaries of interpreters at $400 or $500. A subsequent appropriation, five years later, set "the appropriation for the annual pay of interpreters [at] $300 each, and a large sum was set apart for their additional compensation, to be distributed by the secretary of the interior at his discretion."
*1337 Id. at 149, 3 S.Ct. 151. The Court stated, "[t]he whole question depends on the intention of congress as expressed in the statutes," id. at 150, 3 S.Ct. 151, and observed that the statute clearly stated the number of interpreters to be hired, the salary for those interpreters, and the appropriation of an additional discretionary fund to cover additional compensation. Id. at 149, 3 S.Ct. 151.
The relevance of Mitchell is obscure, for the Court found the clear intent to change interpreters' pay for the subsequent years. There is no relation to the case at bar, where the majority holds that an appropriations rider can change the statutory obligation to compensate for past performance under an ongoing statute. However, Mitchell does reinforce the rule that repeal or suspension of a statute must be manifested by clearly stated intent to repeal or suspend. Also, like Vulte , the act that in Mitchell was "suspended" by a subsequent appropriation was itself an appropriation, not legislation incurring a statutory obligation. The appropriation rider in Mitchell simply modified an existing appropriation. In Moda's situation, however, the panel majority holds that the appropriation rider can suspend the authorizing legislation. No such intent can be found in the statute, as Mitchell requires and as the statute in that case provided.
The panel majority's theory is not supported by Mitchell and Vulte , for the statutes in both cases contain the clearly stated intent to modify existing appropriations. Moda's situation is more like that in Langston , where the Court stated:
it is not probable that congress ... should, at a subsequent date, make a permanent reduction of his salary, without indicating its purpose to do so, either by express words of repeal, or by such provisions as would compel the courts to say that harmony between the old and the new statute was impossible.
Langston , 118 U.S. at 394, 6 S.Ct. 1185. Similarly, it is not probable that Congress would abrogate its obligations under the risk corridors program, undermining a foundation of the Affordable Care Act, without stating its intention to do so. The appropriations riders did not state that the government would not and need not meet its statutory commitment.
Precedent supports the decision of the Court of Federal Claims
In New York Airways, Inc. v. United States , the Court of Claims held that the "mere failure of Congress to appropriate funds, without further words modifying or repealing, expressly or by clear implication, the substantive law, does not in and of itself defeat a Government obligation created by statute." 369 F.2d 743, 748 (Ct. Cl. 1966) (citing Vulte, supra ). The Civil Aeronautics Board had provided subsidies to helicopter carriers according to a statute whose appropriation provision stated:
For payments to air carriers of so much of the compensation fixed and determined by the Civil Aeronautics Board under section 406 of the Federal Aviation Act of 1958 (49 U.S.C. § 1376), as is payable by the Board, including not to exceed $3,358,000 for subsidy for helicopter operations during the current fiscal year, $82,500,000, to remain available until expended.
Id. at 749 (citing 78 Stat. 640, 642 (1964) ). However, the appropriation cap was not sufficient to cover the statutory obligation. The Court of Claims held that the insufficient appropriation did not abrogate the government's obligations to make payments. The court stated that "the failure of Congress or an agency to appropriate or make available sufficient funds does not repudiate the obligation; it merely bars the accounting agents of the Government from disbursing funds and forces the carrier *1338 to a recovery in the Court of Claims." Id. at 817.
Precedent also illustrates the circumstances in which intent to repeal or suspend may validly be found. In Dickerson , Congress had in 1922 enacted a reenlistment bonus for members of the armed forces who reenlisted within three months. For each year between 1934 and 1937 an appropriations rider stated that the reenlistment bonus "is hereby suspended." Dickerson , 310 U.S. at 556, 60 S.Ct. 1034. For fiscal year 1938, the appropriations rider did not contain the same language, but stated that:
no part of any appropriation contained in this or any other Act for the fiscal year ending June 30, 1939, shall be available for the payment' of any enlistment allowance for 'reenlistments made during the fiscal year ending June 30, 1939 ....'
Id. at 555, 60 S.Ct. 1034. The rider in Dickerson cut off funding from all sources, stating "no part of any appropriation contained in this or any other Act ... shall be available." Id. The Court held that the new language continued to suspend the bonus statute, for the words, and the accompanying Congressional Record, display the clear intent to discontinue the bonus payment. The Record stated: "We have not paid [the enlistment bonus] for 5 years, and the latter part of this amendment now before the House is a Senate amendment which discontinues for another year the payment of the reenlistment allowances." 83 Cong. Rec. 9677 (1938) (statement of Rep. Woodrum). The Record and the statutory language left no doubt of congressional intent to continue the suspension of reenlistment bonuses. The panel majority recognizes that the Court in Dickerson found "persuasive evidence" of "Congress's intent to suspend the reenlistment bonus." Maj. Op. at 1324.
In United States v. Will , the Court considered statutes setting the salary of government officials including federal judges. 449 U.S. at 202, 101 S.Ct. 471. In four consecutive years, appropriations statutes had held that these officials would not be entitled to the cost-of-living adjustments otherwise paid to government employees. The annual blocking statutes were in various terms. In one year, the statute stated that the cost-of-living increase "shall not take effect" for these officials. Id . at 222, 101 S.Ct. 471. For two additional years, the appropriations statutes barred the use of funds appropriated "by this Act or any other Act," as in Dickerson . See Will , 449 U.S. at 205-06, 207, 101 S.Ct. 471. The fourth year's appropriation contained similar language, stating that "funds available for payments ... shall not be used." Id. at 208, 101 S.Ct. 471. In each year, the language stated the clear intent that federal funds not be used for these cost-of-living adjustments.
The panel majority finds support in Will , and states that "the Supreme Court never considered the impact of that language in Dickerson or Will ." Maj. Op. at 1325. However, in Dickerson the Court twice repeated the "any other Act" language, Dickerson , 310 U.S. at 555, 556, 60 S.Ct. 1034, in concluding that the language supported the intentional suspension. And in Will , the Court explicitly stated that the statutory language was "intended by Congress to block the increases the Adjustment Act otherwise would generate." Will , 449 U.S. at 223, 101 S.Ct. 471.
The Court found legislative intent clear in these cases. In contrast, the appropriations rider for risk corridors payments does not purport to change the government's statutory obligation, even as it withholds a source of funds for the statutory payment. My colleagues' ratification of some sort of permanent postponement denies *1339 the legislative commitment of the government and the contractual understanding between the insurer and HHS-CMS.
The riders cannot have retroactive effect after inducing participation
The creation of the risk corridors program as an inducement to the insurance industry to participate in the Affordable Care Act, and their responses and performance, negate any after-the-fact implication of repudiation of the government's obligations.
The government argued before the Court of Federal Claims that its obligations to insurers did not come due until the conclusion of the three year risk corridors program, and that "HHS has until the end of 2017 to pay Moda the full amount of its owed risk corridors payments, and Moda's claims are not yet ripe because payment is not yet due." Fed. Cl. Op., 130 Fed.Cl. at 451. We have received no advice of payments made at the end of 2017 or thereafter.
The appropriations rider cannot have retroactive effect on obligations already incurred and performance already achieved. Retroactive effect is not available to "impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result." Landgraf v. USI Film Prods. , 511 U.S. 244, 280, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). Such clear intent is here absent.
Removal of Moda's right to risk corridors payments would "impair rights a party possessed when [it] acted," a "disfavored" application of statutes, for "a statute shall not be given retroactive effect unless such construction is required by explicit language or by necessary implication." Fernandez-Vargas v. Gonzales , 548 U.S. 30, 37, 126 S.Ct. 2422, 165 L.Ed.2d 323 (2006) (quoting United States v. St. Louis, S.F. & Tex. Ry. Co. , 270 U.S. 1, 3, 46 S.Ct. 182, 70 L.Ed. 435 (1926) ). Such premises are absent here.
Moda has recourse in the Judgment Fund
The Government does not argue that the Judgment Fund would not apply if judgment is entered against the United States, in accordance with Section 1491 :
The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.
28 U.S.C. § 1491.
The Judgment Fund is established "to pay final judgments, awards, compromise settlements, and interest and costs specified in the judgments or otherwise authorized by law when ... payment is not otherwise provided for ...." 31 U.S.C. § 1304(a) ; see also 28 U.S.C. § 2517 ("Except as provided by chapter 71 of title 41, every final judgment rendered by the United States Court of Federal Claims against the United States shall be paid out of any general appropriation therefor.").
The contract claim is also supported
The Court of Federal Claims also found that the risk corridors statute is binding contractually, for the insurers and the Medicare administrator entered into mutual commitments with respect to the conditions *1340 of performance of the Affordable Care Act. The Court of Federal Claims correctly concluded that an implied-in-fact contract existed between Moda and the government. I do not share my colleagues' conclusion that "Moda cannot state a contract claim." Maj. Op. at 1330.
CONCLUSION
The government's ability to benefit from participation of private enterprise depends on the government's reputation as a fair partner. By holding that the government can avoid its obligations after they have been incurred, by declining to appropriate funds to pay the bill and by dismissing the availability of judicial recourse, this court undermines the reliability of dealings with the government.
I respectfully dissent from the panel majority's holding that the government need not meet its statutory and contractual obligations established in the risk corridors program.

Moda Health Plan, Inc. v. United States, 130 Fed.Cl. 436 (2017) ("Fed. Cl. Op.").

The panel majority, responding to this dissent, states that it is not ratifying an indefinite suspension of payment. Maj. Op. at 1325, n.6. However, payment has not been made, and the majority finds "the clear implication of Congress's intent to prevent the use of taxpayer funds to support the risk corridors program." Maj. Op. at 1329. Thus Moda, and the other participating insurers, have been forced into the courts.

The panel majority argues that "we need not" consider Congress' refusal to enforce budget neutrality in the risk corridors program. Maj. Op. at 1327. The Court has stated otherwise: "When the repeal of a highly significant law is urged upon that body and that repeal is rejected after careful consideration and discussion, the normal expectation is that courts will be faithful to their trust and abide by that decision." Sinclair Refining Co. v. Atkinson , 370 U.S. 195, 210, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962), overruled on other grounds by Boys Mkts., Inc. v. Retail Clerks Union, Loc. 770 , 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).